JOHN DARRILL CONNELLY, Plaintiff-Appellee, v. GENERAL MOTORS CORPORATION, Defendant-Appellant.

First District (1st Division)   No. 1—88—1081

Opinion filed May 1, 1989.—Rehearing denied June 23, 1989.

Lord, Bissell & Brook, of Chicago, and General Motors Corporate Office of the General Counsel, of Detroit, Michigan (William J. White, Hugh C. Griffin, Douglas L. Toering, and Judith A. Zakens, of counsel), for appellant.

Asher, Pavalon, Gittler & Greenfield, Ltd., of Chicago (Eugene I. Pavalon, Geoffrey L. Gifford, and Gary K. Laatsch, of counsel), for appellee.

JUSTICE QUINLAN* delivered the opinion of the court:

The plaintiff, John Connelly, sued the defendant, General Motors Corporation, alleging that the defendant was strictly liable for injuries that plaintiff had sustained in an automobile accident. The accident occurred when the right rear tire of a 1969 General Motors Buick Opel Kadett Model 1900 station wagon blew out, causing the vehicle to leave the road and flip over twice, during which time the plaintiff was thrown from the car. The plaintiff alleged that defendant was strictly liable for the defective design of its vehicle and for failure to warn of a dangerous condition. The trial jury returned a verdict for plaintiff on both of his strict liability counts and awarded him $5 million, which was reduced by the amount the plaintiff had received from a settlement with Uniroyal, the tire manufacturer. General Motors now appeals the verdict for plaintiff to this court. We affirm.

In late October 1970, plaintiff, a 19-year-old University of Chicago student, drove to California with four other university students. Plaintiff borrowed his father's car for the trip, a 1969 Opel Kadett Model 1900 station wagon (Model 1900). En route to California, the students stopped at a gas station and had the tires on the station wagon rotated because the front tires were more worn than the back tires. The plaintiff then instructed the attendant to inflate the back tires to 32 pounds per square inch (psi), in accordance with directions in the owner's manual for the car. The plaintiff also noted at that time that the owner's manual recommended a maximum load of 900 pounds for the

---

*Justice Quinlan participated in this decision prior to his assignment to the sixth division.

vehicle. It was estimated that the combined weight of the five students and their luggage was 860 pounds. Michael Rosin, one of the students, testified that the only other incident occurring on the way to California was when the station wagon was driven for a short time on a gravel road, although plaintiff did not remember driving on such a road.

When the students arrived in California, they unloaded the station wagon. They drove the unloaded vehicle while in California and at certain times the station wagon may have carried as many as seven people. The students stayed in California for several days and then began their return to Chicago. Plaintiff testified that shortly before the accident, the students gave a ride to a hitchhiker, who was in the car for approximately four to five hours. However neither Michael Rosin nor Jean Howard, another student who testified at trial, remembered picking up a hitchhiker. On the way to Chicago, the plaintiff testified that they stopped briefly in Colorado and dropped off the hitchhiker. The students then resumed their journey. The posted speed limit was 70 miles per hour and the students were driving approximately 75 miles per hour when the blow out occurred. There was no evidence that the station wagon had hit or run over any objects in the road just before the blow out. Plaintiff suffered severe injuries when he was thrown from the car and, as a result of those injuries, the plaintiff was rendered a paraplegic.

Thereafter, the plaintiff filed suit against General Motors Corporation, alleging that the defendant was strictly liable for the defective design of the Model 1900 because the Model 1900 had an inadequate and dangerous tire reserve load percentage. Plaintiff further alleged that the defendant was strictly liable for failing to warn that overloading the Model 1900 would lead to a tire blow out.[1]

The tire on the vehicle here had 18,830 miles on it and was the car's original tire. Information was stamped on the sidewall of the tire which said that the tire had a maximum load capacity of 880 pounds and the owner's manual recommended inflation of the rear tires to 32 psi. The tire was manufactured by Uniroyal at its Belgium plant in June 1969 and was installed on the Opel Kadett Model 1900 in Opel's Belgium plant. Also, Opel was a wholly owned subsidiary of the defendant General Motors.

---

[1]The plaintiff had additionally filed suit against Uniroyal, but later reached a settlement with Uniroyal before the case proceeded to trial. As part of his settlement with Uniroyal, plaintiff specifically agreed that he would not pursue a cause of action against General Motors for a manufacturing defect.

The relevant testimony at trial was as follows. Plaintiff presented two witnesses who were qualified as experts in tire failure. The first witness, Ronald Schoonover, testified that in his opinion the tire blow out on plaintiff's Opel Kadett station wagon was due to an adhesion failure in the tire combined with vehicle overload. Schoonover stated that the tire was not worn out, nor did the tire show any evidence of impact failure. Schoonover explained that adhesion problems were typical in tires manufactured at that time, so manufacturers compensated for the adhesion problems by building a tire reserve load into the tires, which provided the tires with a percentage of extra strength. The tires, then, with this extra strength, would wear out before a blow out due to adhesion problems could occur. Schoonover said that the higher the percentage of tire reserve load, the safer the load margin.

Schoonover testified that the Model 1900 had a tire reserve load safety margin of 2%, basing this 2% figure on information that defendant itself had submitted to the U.S. Department of Transportation, which was then published in a booklet entitled "Performance Data For New Passenger Cars and Motorcycles." He said the figure determined the amount of overload a tire could safely endure. Schoonover believed that a 2% margin of safety was inadequate and unreasonably dangerous for the Model 1900 since the Model 1900 was a station wagon and was specifically designed to transport larger loads than regular-sized cars. Schoonover noted that other tires were available to the defendant at the time the Model 1900s were manufactured that provided a greater tire reserve load margin of safety and which also fit the rims on the Model 1900. Those tires, he stated, could have been used on the Model 1900 without requiring the defendant to alter the Model 1900's design.

John Stilson also testified for the plaintiff as an expert witness. Stilson's opinion was that the tire here blew out due to overloading, which precipitated an adhesion defect in the tire. Stilson found nothing in the owner's manual which warned that exceeding the 900-pound maximum weight on the vehicle would cause premature failure of the tires. Stilson said that the defendant was aware of the dangers in overloading the Model 1900, because within two months after plaintiff's car had been manufactured, the defendant was required by Federal regulations to put a warning on all cars it manufactured regarding vehicle overload.

Stilson believed that the 2% tire reserve load safety margin on the defendant's Model 1900 was unreasonably dangerous, and he also stated that he knew there were other tires available to defendant at

that time which fit the rim of the vehicle as designed and provided a higher margin of safety. In addition, Stilson observed that the tire used on the Model 1900 was used on all of defendant's Opel vehicles, but that it provided a higher tire reserve load safety margin on those vehicles because they weighed less than the Model 1900. Stilson found no signs of external road impact on the tire and disagreed with the defendant's experts, who believed that the tire failed because it encountered an object in the road.

The defendant then presented three expert witnesses of its own. Sjirk VanderBurg, defendant's first expert, was not a tire-failure expert, but had been the director of research and development for Uniroyal when the tire in this case was manufactured. VanderBurg said that when a tire manufacturer wanted to build a tire which would have an 880-pound load capacity at 32 psi, the manufacturer would design the tire so that it could be inflated to 8 to 10 times its normal inflation pressure when it had no weight on it. The manufacturer would then perform tests on the tires. In the first test, the tire was inflated to 36 psi and run at 37½ miles per hour for 24 hours, with a load of 880 pounds. Every 24 hours, for 120 hours thereafter, the load was increased by approximately 80 pounds. In order to pass the quality control standards, the tire must last for 120 hours and by the end of the testing period have held 1,322 pounds of weight.

VanderBurg further stated that the tires manufactured in 1969 also had to meet Federal Motor Vehicle Standard 109, which was an endurance and high speed test. In this test, a tire designed for a 32 psi load was inflated to 24 psi and loaded with 750 pounds, the maximum weight for that pressure. The tire was then tested for six hours at 50 miles per hour. Next, he said, it was tested for six hours with an 820-pound load, which was 108% over the rated load capacity. The load was finally increased to 880 pounds at 24 psi for 24 hours, or 117.5% over the rated load capacity. The tire had to pass the test of 880 pounds at 24 psi in order to pass Standard 109. If a tire met Standard 109, VanderBurg testified, Uniroyal subjected it to yet another test. In this test, the same tire was inflated to 20 psi and loaded with 880 pounds for 48 hours. At 20 psi, the tire's rated load capacity was 640 pounds, so the tire was 137.5% over its rated load capacity. According to VanderBurg, Uniroyal did not market a tire unless it had passed the last test. VanderBurg concluded that in his opinion, a load weighing over 880 pounds on a tire inflated to 32 psi, as the tire here, would not create a danger if the tire had not encountered any road hazards during its lifetime.

On cross-examination, VanderBurg admitted that the tests mea-

suring the effect of different weight loads on the tires were designed to determine an inflation overload factor, not a tire reserve load factor. In addition, VanderBurg was unaware of any tests done by Uniroyal or by the defendant where a Model 1900 was tested at its rated load capacity of 880 pounds with its tires inflated to 32 psi. Moreover, he agreed that the tires that were tested were newly manufactured and were tested on a test wheel in a controlled environment, rather than on an automobile under road conditions. Additionally, Vander-Burg testified that he had never examined the tire at issue in this case, nor would he render an opinion regarding the cause of the tire failure on plaintiff's car.

Anthony Parrottino was the defendant's next witness. Parrottino testified that he was employed by the defendant and from 1968-75 was the manager of reliability and quality control for two of defendant's assembly plants in Belgium. Because the trial court refused to allow Parrottino to testify concerning lack of complaints similar to the plaintiff's, the defendant made an offer of proof regarding the testimony. In the offer of proof, Parrottino said that his responsibilities as manager of reliability and quality control had included receiving complaints about the defendant's vehicles and that he had never received any other complaints similar to plaintiff's complaint.

James Tomlinson was defendant's third expert witness. Tomlinson testified that a 2% tire reserve load was reasonable and that large tire reserve loads did not make any additional contributions to safety. He also noted that the Federal regulations requiring manufacturers to disclose tire reserve loads was abolished in 1982 because the National Highway Traffic Safety Administration concluded that the information was of no value to consumers. He said that even if the Model 1900 here had been overloaded with a sixth passenger for four to five hours, this overload of approximately 60 pounds would not have created a hazard that required a warning and would not have caused a blow out. Tomlinson inspected the tire and found no signs of severe overloading. In his opinion, the blow out occurred due to a road hazard encountered when the plaintiff's car was driven on a dirt and gravel road.

As noted earlier, following presentation of the above evidence for the plaintiff and the defendant, the jury returned a verdict for plaintiff. The defendant's post-trial motions were denied and it subsequently filed the appeal in this court.

On appeal, defendant initially contends that it was entitled to a judgment *n.o.v.* on both the plaintiff's defective design theory and his failure to warn theory. The defendant claims that plaintiff's experts

relied upon the "absolutely untrue" assumptions that the Model 1900 tires had a maximum load capacity of 880 pounds, along with only a 2% margin of safety, and that the jury's verdict based upon these untrue assumptions should have been set aside. The defendant also contends that plaintiff's experts ignored the evidence that the Model 1900 tires had safety margins of 117% and 137.5%, and that, consequently, the opinions of plaintiff's experts were not based upon the facts of the case and defendant was entitled to judgment in its favor as a matter of law.

The plaintiff responds that there was more than sufficient evidence to support his experts' opinions and, in fact, there was little evidence to support defendant's claim that its tires had a tire reserve load safety margin greater than 2%. Thus, the plaintiff asserts that this court should affirm the trial court's judgment.

■ Judgment *n.o.v.* is proper only when all of the evidence in the case, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that the jury's verdict based on that evidence cannot stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14; *Robles v. Chicago Transit Authority* (1988), 173 Ill. App. 3d 46, 50, 527 N.E.2d 361, 364; *International Meat Co. v. Bockos* (1987), 157 Ill. App. 3d 810, 814, 510 N.E.2d 1013, 1016.) Furthermore, a trial judge should not substitute his or her judgment for that of the jury merely because he or she would have reached a different conclusion concerning the credibility of witnesses or the preponderance of evidence. (*In re Village of Bridgeview* (1985), 139 Ill. App. 3d 744, 753, 487 N.E.2d 1109, 1116.) It is also erroneous for a trial court to enter a judgment *n.o.v.* when there is a substantial factual dispute in the case or when the assessment of a witness's credibility or the evaluation of conflicting evidence is necessary to determine the outcome of the case. *Cadral Corp. v. Solomon, Cordwell, Buenz & Associates, Inc.* (1986), 147 Ill. App. 3d 466, 482, 497 N.E.2d 1285, 1295; *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 509, 492 N.E.2d 1364, 1372.

■ In this case, plaintiff's experts testified that the 2% tire reserve load was based on information that the defendant submitted to the Federal government in the "Performance Data for New Passenger Cars and Motorcycles" booklet (Performance Data booklet). This 2% factor was based on an Opel Kadett Model 1900 station wagon, with the rear tires inflated to 32 psi. This defendant did not dispute that it had submitted the 2% figure, but claimed that this figure was inaccurate. The defendant claimed that the 2% figure was submitted merely to show the government that the Model 1900 complied with

Federal standards and that the tires on the Model 1900 actually had a 117% and a 137.5% tire reserve load factor. We note, however, as the defendant's experts admitted on cross-examination, that these factors were based on tests to determine inflation overload rather than tire reserve load and were performed on tires inflated to only 24 psi. We further note that defendant failed to introduce any evidence of tests performed on the Model 1900.

Based upon a review of the record, we find that the evidence here was conflicting and that the plaintiff's experts relied upon information submitted to the Federal government by defendant; hence, these experts did not rely upon absolutely untrue assumptions as claimed by the defendant. The trial jury here was in the best position to evaluate the conflicting evidence and, viewing all of the evidence in this case in a light most favorable to the plaintiff, we cannot say that the evidence so overwhelmingly supported the defendant that the jury's verdict could not stand. Accordingly, the trial court properly denied the defendant's motion for a judgment *n.o.v.*.

Defendant next claims that it was deprived of a fair trial when the trial court refused to admit defense exhibit C, the Performance Data booklet, into evidence and, thus, the defendant asserts it was entitled to a new trial. Defendant argues that the excluded exhibit, which listed tire reserve load percentages for all vehicles sold in the United States as of January 1, 1970, was admissible in this case as evidence of industry standards, practices and customs. Further, it contends that this exhibit was crucial because the booklet showed that other station wagons in 1970 had tire reserve loads which were less than 2%, and this proved that the Model 1900 with a 2% tire reserve load was not defectively designed.

Conversely, the plaintiff argues that defendant failed to preserve this issue for review because it never proffered the Performance Data booklet to the court as evidence, never offered any testimony concerning the contents of the booklet, and never made an offer of proof. Further, even if this issue was properly preserved for review, the plaintiff asserts that the booklet merely contained "state of the art" evidence, which evidence the defendant could not, in any event, have properly used as a defense in a strict liability case.

■ Evidence of "state of the art" is not a defense to a strict liability case. (See *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 266 N.E.2d 897; *Murphy v. Chestnut Mountain Lodge, Inc.* (1984), 124 Ill. App. 3d 508, 464 N.E.2d 818; *Gelsumino v. E.W. Bliss Co.* (1973), 10 Ill. App. 3d 604, 295 N.E.2d 110.) A plaintiff in a strict liability action, however, may introduce evidence of feasible al-

ternative designs and, in such a case, the defendant may then introduce state of the art type evidence as rebuttal evidence on that issue (*Murphy*, 124 Ill. App. 3d at 515, 464 N.E.2d at 823), such as evidence of compliance with national or Federal standards (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 443 N.E.2d 575; *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534; *Turney v. Ford Motor Co.* (1981), 94 Ill. App. 3d 678, 418 N.E.2d 1079; *Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311).

■ However, here we agree with the plaintiff and hold that the evidence offered of tire reserve load percentages on station wagons manufactured by other automobile companies was impermissible state of the art evidence. The plaintiff did not attempt to present evidence of a feasible alternative design for the Model 1900, which might have opened the door for defendant to introduce rebuttal evidence, but instead presented evidence that tires with higher tire reserve load percentages could have been used on the Model 1900 without altering the design of the vehicle. This did not allow the defendant to present state of the art type evidence. In addition, while defendant claims that a 2% tire reserve load margin was the industry standard, the evidence at trial showed that other vehicles manufactured by defendant's own Opel division had significantly higher tire reserve load percentages. Finally, the defendant was in fact allowed to introduce evidence that it had complied with Federal standards. Hence, we do not find that the defendant was denied a fair trial by the trial court's exclusion of the Performance Data booklet.

The defendant next argues that exhibit C, the Performance Data booklet, was admissible under the "Rule of Completeness." The defendant contends that because plaintiff's experts were allowed to testify based on portions of the Performance Data booklet, under principles of fairness it was entitled to have other portions of that booklet admitted into evidence.

■■ The rule of completeness is a rule of evidence providing that "if one party introduces part of an utterance or writing the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury." (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 556, 356 N.E.2d 779, 786.) In *Lawson*, our supreme court held that the rule of completeness applied to allow the defense to introduce an entire committee report into evidence because the plaintiff there had repeatedly referred to portions of that report which were beneficial to her case. (*Lawson*, 64 Ill. 2d at

556, 356 N.E.2d at 786.) The supreme court said that the defendant could introduce the entire committee report, including portions that were detrimental to the plaintiff's case, in order to put the committee report in its proper context. (*Lawson*, 64 Ill. 2d at 556, 356 N.E.2d at 786.) In contrast, we find that the plaintiff's experts here did not take the information in the Performance Data booklet concerning Opel vehicles out of context, nor did they distort the meaning of the booklet because, unlike the situation in *Lawson*, all information concerning defendant's vehicles was introduced into evidence, rather than only select portions of information.

The fourth issue that the defendant raises on appeal is that the Performance Data booklet should have been admitted into evidence to rebut the plaintiff's evidence of industry standards, practices and customs. The defendant alleges that the plaintiff's experts testified concerning tire reserve loads and safety practices of other automobile manufacturers and, therefore, the defendant was entitled to present rebuttal testimony concerning this evidence. The plaintiff responds that any testimony concerning other manufacturers was elicited by the defendant, was not objected to by the defendant and, thus, the defendant cannot now claim that the exclusion of the Performance Data booklet from evidence constituted reversible error.

■■ ■ An error in the exclusion of evidence does not require reversal where there is no prejudice or where the evidence has not materially affected the result in the case. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 476 N.E.2d 1232, 1237.) Here, we cannot say that the exclusion of the Performance Data booklet prejudiced the defendant in any way. As the plaintiff noted, the defendant did not object to the testimony of plaintiff's experts. Further, Schoonover mentioned only once on direct examination that a 10% to 15% tire reserve load was built into the tires of another manufacturer, and the defendant on cross-examination in fact specifically questioned Schoonover about this 10% to 15% figure. Also, the defendant questioned Stilson on cross-examination concerning Stilson's deposition testimony that Ford Motor Company attempted to maintain a 150% safety factor in their vehicles, even though the plaintiff had never mentioned this deposition testimony in his direct examination of Stilson. Therefore, since the defendant itself brought out much of this testimony, it cannot now claim that the admission of the testimony and the exclusion of the Performance Data booklet prejudiced it in the presentation of its case. Moreover, the other testimony which the defendant now finds objectionable did not concern specific tire reserve load figures; hence, the Performance Data booklet could not, in any

event, have been used to rebut that testimony.

The defendant also contends that it should have been allowed to rebut the testimony concerning industry customs, standards and practices because the testimony was introduced while the plaintiff still had a negligence count pending against the defendant, although he later dropped the negligence count. The defendant alleges that the plaintiff deliberately waited to drop his negligence count until he had introduced evidence of industry standards, and then dropped the count before the defendant could rebut that evidence. The trial court, in ruling on the issue, held that the plaintiff was free to drop his negligence count whenever he wished and that defendant was not prejudiced by the court's refusal to admit the Performance Data booklet into evidence.

A trial court's determination of whether evidence is or is not admissible is a matter of discretion and will be reversed only if it is clear that the trial court abused its discretion. (*Behrstock v. Ace Hose & Rubber Co.* (1986), 147 Ill. App. 3d 76, 84, 496 N.E.2d 1024, 1029.) The record here shows that the trial court did not abuse its discretion in refusing to admit the Performance Data booklet into evidence. Although plaintiff waited until after the trial had commenced to drop his negligence count, the focus of the case to that point was on the strict liability counts. Therefore, the jury was not presented with extensive evidence centering on negligence which the defendant was then left unable to rebut when the negligence count was dropped. Finally, as noted above, the defendant itself brought out much of the evidence to which it now objects. Thus, the admission of the testimony by plaintiff's experts and the exclusion of the Performance Data booklet did not amount to reversible error.

In its next issue on appeal, the defendant contends that the Performance Data booklet was admissible in order to cross-examine and challenge the credibility of plaintiff's experts. Defendant asserts that it was prejudiced by the trial court's refusal to allow it to cross-examine Stilson and Schoonover based on the Performance Data booklet, because the booklet would have shown that Stilson and Schoonover ignored evidence that the Model 1900 had an adequate tire reserve load based on a comparison with tire reserve loads of other vehicles.

The defendant relies upon *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297, in support of this argument, asserting that *Trower* buttresses its contention that an attorney should be given great latitude in cross-examining expert witnesses and that its attorney was not given such latitude here. However, the issue in *Trower* was

whether an expert witness could be cross-examined concerning his annual fees for testifying as an expert and the frequency with which he had testified as an expert witness (*Trower*, 121 Ill. 2d 211, 520 N.E.2d 297), issues which were irrelevant to the cross-examination of Stilson and Schoonover.

Next, we further note that the scope and extent of cross-examination is committed to the sound discretion of the trial court and a reviewing court will not disturb a trial court's ruling in this regard unless the trial court has abused its discretion and the party cross-examining was thereby prejudiced. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 518, 492 N.E.2d 1364, 1377-78.) Here, the trial court did not abuse its discretion when it refused to allow defendant to cross-examine plaintiff's experts based on the Performance Data booklet. The defendant was allowed to challenge Stilson's and Schoonover's conclusions and to confront them with the conclusions reached by its own experts. Also, the record shows that defendant did in fact challenge the credibility of plaintiff's experts and was not prejudiced in its cross-examination due to the exclusion of the Performance Data booklet from evidence.

■■■ The defendant's sixth issue on appeal is that its own experts should have been allowed to testify that they relied on the Performance Data booklet in concluding that the Opel Kadett Model 1900 tire was not unreasonably dangerous. The defendant, relying on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, asserts that an expert can testify concerning the data upon which he based his opinion, even though that data itself might not be admissible in evidence.

In *Wilson*, the Illinois Supreme Court adopted Rules 703 and 705 of the Federal Rules of Evidence and held that an expert could give an opinion based on facts not in evidence, ruling that adoption of these rules would save time and expedite trial proceedings by eliminating the need for authenticating witnesses. (*Wilson*, 84 Ill. 2d 186, 417 N.E.2d 1322.) Specifically, the supreme court there held that a physician could render an opinion in response to a hypothetical question concerning certain hospital records, even though the records were not in evidence, because hospital records are highly reliable since they are normally relied upon by doctors in rendering opinions. *Wilson*, 84 Ill. 2d at 194, 417 N.E.2d at 1326. See also *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 530 N.E.2d 1007 (report must be the type reasonably relied upon by experts, hence, reports made in expectation of litigation not admissible); *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066 (doctor may testify about statements made by medical personnel if he relied upon those statements).

We do not find *Wilson* applicable to this case. This case is more analogous to the situation in *Lovelace v. Four Lakes Development Co.* (1988), 170 Ill. App. 3d 378, 523 N.E.2d 1335. In *Lovelace*, the Second District Appellate Court held that although substantively inadmissible evidence may be admissible for the limited purpose of explaining the basis for an expert's opinion, the expert must show that reliance on the evidence was both customary in his field and reasonable. (*Lovelace*, 170 Ill. App. 3d at 382-83, 523 N.E.2d at 1338.) The court there, however, stated that the proponent of otherwise inadmissible evidence would not be allowed to circumvent the exclusion of the evidence merely by finding an expert to rely upon the evidence in forming his opinion. *Lovelace*, 170 Ill. App. 3d at 384, 523 N.E.2d at 1339.

Likewise, here, testimony concerning other automobile manufacturers was inadmissible state of the art evidence and was irrelevant to plaintiff's case. Therefore, any reliance by defendant's experts upon this evidence would be unreasonable. In fact, it is unclear whether defendant's experts even actually relied upon the Performance Data booklet in reaching their conclusions, inasmuch as they testified at trial that they believed the Model 1900 was safe because it had inflation reserve loads of 117% and 137.5% and not because they had compared the Model 1900 to other vehicles.

Defendant's seventh and last issue on appeal is that it was denied a fair trial because it was not allowed to introduce evidence of lack of prior complaints or claims concerning the tire reserve load capacity on its Model 1900. Defendant asserts that this evidence should have been admitted to rebut the plaintiff's claim that the Opel Kadett tires were defectively designed. The plaintiff responds that this evidence was inadmissible because defendant failed to lay the proper foundation for the evidence.

A party seeking to introduce evidence concerning a lack of prior claims must first lay the proper foundation for the admission of the evidence. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 905, 489 N.E.2d 394, 400.) The proponent of such evidence must show that the absence of such claims occurred when others were using the same product as the injured party under conditions substantially similar to those conditions present when the injury occurred. (*Myre v. Kroger Co.* (1988), 176 Ill. App. 3d 160, 167-68, 530 N.E.2d 1122, 1126; *Salvi*, 140 Ill. App. 3d at 905, 489 N.E.2d at 400.) A trial court's decision to admit or refuse to admit evidence is a matter of discretion, and its decision should be reversed on appeal only if the court has abused its discretion. *Myre*, 176 Ill. App. 3d at 168, 530 N.E.2d at 1126.

■ Here, defendant's expert Parrottino testified, in an offer of proof, that he was responsible for receiving complaints concerning defendant's Opel Kadetts and that he had never received a complaint regarding a tire blow out due to overloading. But, defendant failed to provide any evidence that the absence of these complaints occurred when others were using the same product as the plaintiff under conditions substantially similar to those present here. Further, on cross-examination in defendant's offer of proof, Parrottino admitted that he might be unaware of some tire blow outs that had occurred on Model 1900s. For example, Parrottino said he might not learn of a blow out if the Model 1900 owner merely took the vehicle to a gas station for repairs, without reporting the blow out to the defendant. Consequently, we find that the defendant failed to establish the proper foundation here to admit evidence of lack of prior complaints and that the trial court did not abuse its discretion in excluding this evidence.

Therefore, for all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.