FREDRICK KNIGHT, as Special Adm'r of the Estate of Patrice A. Knight, Deceased, Plaintiff-Appellant, v. A. LEE HAYDARY *et al.*, Defendants-Appellees.

Second District   No. 2—90—1431

Opinion filed January 17, 1992.—Rehearing denied February 11, 1992.

Patricia N. Hale, of James H. Canel, Ltd., of Chicago (James H. Canel, of counsel), for appellant.

Joanne Smith Johnston and Lenard C. Swanson, both of Wildman, Harrold, Allen & Dixon, of Chicago, Wildman, Harrold, Allen & Dixon and Mark C. Meyer and William F. Cunningham, both of O'Reilly, Cunningham, Norton & Mancini, both of Wheaton, and Jonathan L. Carbary, of Roeser, Vucha & Carbary, Wayne M. Jensen, of Brady, McQueen, Martin, Collins & Jensen, and Jeffrey B. Rifken, of Rifken & Rifken, all of Elgin, for appellees.

JUSTICE McLAREN delivered the opinion of the court:

This appeal involves an action in malpractice against two doctors, A. Lee Haydary and Erwin Robin. The case is brought by Fredrick Knight, as special administrator of the estate of Patrice Knight, deceased, in a wrongful death action and a survival action. The alleged negligence resulted in severe brain damage causing death while Patrice was under the care of Dr. Haydary for treatment of a miscarriage. The case was tried before a jury in the circuit court of Kane County. At the close of plaintiff's case in chief, the trial court granted a directed verdict in favor of Dr. Robin. After a full trial, the jury returned a verdict in favor of Dr. Haydary. Plaintiff now appeals from these verdicts.

The issues presented for review are (1) whether plaintiff is entitled to a judgment notwithstanding the verdict (*j.n.o.v.*) on the issue of Dr. Haydary's liability and a new trial on the issue of damages, (2) whether the jury verdict in favor of Dr. Haydary was contrary to the manifest weight of the evidence, and (3) whether the trial court erred in barring one of plaintiff's experts from testifying. We affirm.

On July 18, 1983, Patrice Knight was admitted to the Sherman Hospital emergency room in order to receive care for a miscarriage occurring between the 12th and 14th weeks of pregnancy. Her obstetrician and gynecologist, Dr. A. Lee Haydary, instructed her to come to the hospital after determining through a telephone conversation that her amniotic sac had ruptured, indicating an abnormal event in her pregnancy. After passing the fetus, Patrice was admitted to the labor and delivery unit of the hospital where she received an IV of 1,000 cc's of "Lactated Ringer's" solution containing one ampule (1

cc) of Pitocin. Following surgery, patients who should not eat solid foods are given an IV which injects a nourishing solution into the body. When patients receive liquids of this type, they must also receive electrolytes in order to maintain the proper balance of certain elements in the body, such as sodium, with the fluids within the body. Electrolytes are contained in the foods people eat. However, they can also be reduced to a fluid state. "Lactated Ringer's" is a solution which contains these essential electrolytes and is administered to a patient through an IV.

Pitocin, a brand-name manufactured drug, is a synthetic preparation of a naturally occurring hormone, oxytocin, which is produced in the area of the brain called the hypothalamus. Pitocin is used to promote the expulsion of the products of conception that might still be in the uterus. If the uterus is not emptied of the products of conception, it will continue to bleed. One potential side effect of Pitocin is that it may cause hyponatremia, due to its intrinsic antidiuretic effect. In other words, it may cause an individual to retain water which would otherwise be excreted. Such water retention could result in damaging swelling to the body including parts of the brain.

Upon her admission to the hospital, a complete blood count (CBC) was taken from Patrice. A CBC is used in order to determine, among other things, whether there is a proper balance between essential electrolytes and body water.

Approximately 2½ hours after her admission to the labor and delivery department, Patrice passed additional tissue. Later that evening, a second IV bottle of 1,000 cc's of "Lactated Ringer's" with one ampule of Pitocin was administered with Dr. Haydary's consent. The following morning of July 19, Patrice received a third IV bottle of "Lactated Ringer's" with one ampule of Pitocin. Because the previous IV became clotted with blood, it was discontinued with 200 cc's remaining in the bottle. That morning, Dr. Haydary visited Patrice, performed an examination, and diagnosed an incomplete abortion based upon his findings of a uterus enlarged to six times normal size and a vagina filled with blood. In order to remove the tissue or products of conception from the uterine cavity, Dr. Haydary performed a dilation and curettage (D&C), a surgical procedure involving a scraping of the wall of the uterus. Following the D&C procedure at approximately 1:45 p.m., Patrice received a fourth IV bottle. This IV contained one ampule of Pitocin, along with 1,000 cc's of 5% dextrose and water (D5W). This IV was to be administered over a 12-hour period. The D5W solution has a nutritive value but contains no electrolytes. In ad-

dition, Patrice was permitted to have a general diet and to take fluids as desired.

Patrice received a fifth IV bottle of 1,000 cc's D5W with one ampule of Pitocin at 3:30 a.m. July 20. At this time Patrice began to develop a headache for which she received several forms of medication and treatment from the nurses on duty. At approximately 5:30 a.m., Patrice vomited and reported some relief of her headache. At approximately 8 a.m., Patrice stated to a nurse that she was experiencing a less-severe headache for which she obtained pain medication from the nurse in the form of a pill. Patrice then became weepy and spoke with the nurse about her miscarriage. Patrice subsequently vomited a small amount.

Dr. Haydary visited Patrice in her hospital room at approximately 10:50 a.m. on July 20. Patrice complained of headache, nausea, vomiting, and diarrhea to Dr. Haydary. She believed that she had the flu and felt unable to go home. As a result, Dr. Haydary decided to keep her in the hospital. Prior to leaving that morning, Dr. Haydary ordered Vistaril to control the vomiting and relieve the headache. While he was at the hospital, Dr. Haydary told a nurse to discontinue Patrice's IV with Pitocin, which had about 200 cc's of fluid remaining. A nurse hung an IV of D5W without Pitocin at around noon.

At approximately 1 p.m. Patrice was found to be unconscious and having seizure-like movement in her arms. A nurse called Dr. Haydary to inform him of Patrice's condition. Dr. Haydary, who was out of the hospital at the time, ordered a complete blood count and a blood clotting test and arranged to have a physician see Patrice. This physician was Dr. Erwin Robin, an internist with a specialty in cardiac medicine. Following the seizure-like movements, Patrice began screaming, and then she began to rest.

Dr. Robin arrived at approximately 2 p.m. and examined Patrice. In the course of this examination he was able to listen to her heart, take her blood pressure, and conduct a brief neurological examination by checking her pupillary reflexes. Patrice was unable to respond verbally to his questions. Dr. Robin found Patrice to be medically and neurologically normal and determined that her actions reflected possible psychological problems. Dr. Robin called Dr. Haydary, suggested that he come to the hospital, and advised that the patient be seen by either a psychiatrist or a neurologist.

At 3 p.m. a psychiatrist arrived who also conducted a neurological examination. This examination included a look into Patrice's eyes in order to assess whether there was pressure in the brain by examining the fundus of the eye with an ophthalmoscope. The psychiatrist found

the eyes to be within normal limits. Her reflexes were also assessed to be within normal limits. However, after 10 or 15 minutes, the psychiatrist observed Patrice undergo a grand mal seizure lasting approximately 10 minutes. After witnessing the seizure and noting that one pupil was markedly dilated compared to the other one, as well as finding a positive babinksi sign (where the big toe moves when the outer side of the foot is scratched), the psychiatrist felt there was an organic problem with Patrice's brain. The psychiatrist then transferred Patrice to the intensive care unit at Sherman Hospital and called Dr. Haydary to advise him of the patient's development. The psychiatrist indicated that the situation required a neurologist or a neurosurgeon. Dr. Haydary agreed. Within five minutes, a neurologist (Dr. Lupton) arrived.

When Dr. Lupton arrived at approximately 4:30 p.m., Patrice was confused and combative, so Dr. Lupton prescribed Valium. Dr. Lupton proceeded to conduct a neurological examination. His initial assessment was that Patrice was normal, but at approximately 5 p.m., Patrice became less responsive and her pupils became dilated and fixed. Her blood pressure then became exceedingly elevated and suddenly fell to zero. She stopped breathing and signs of an intact brain stem were absent.

Patrice died of hyponatremia, a state characterized by the retention of water in the body and inappropriately low levels of sodium. The decreased sodium level causes the brain to swell. In this instance, the swelling took place to such an extent that the brain was herniated from the brain stem, ineluctably causing death.

Plaintiff first argues that he is entitled to a judgment notwithstanding the verdict (j.n.o.v.) on the issue of Dr. Haydary's liability for damages resulting from the death of Patrice. Under the *Pedrick* standard, plaintiff is entitled to a *j.n.o.v.* only if all of the evidence viewed in the aspect most favorable to the defendant so overwhelmingly favors the plaintiff that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Connelly v. General Motors Corp.* (1989), 184 Ill. App. 3d 378, 385.) The *Pedrick* standard is properly applied in reviewing the denial of a motion for *j.n.o.v. Runimas v. Howe* (1981), 94 Ill. App. 3d 357, 359.

■ In a medical malpractice case, the plaintiff, by use of expert testimony, must establish the standards of care against which the defendant/doctor's conduct is measured. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423.) The plaintiff must then prove that, judged in the light of these standards, the doctor was unskillful or negligent

and that his want of skill or care caused the injury to the plaintiff. (*Borowski*, 60 Ill. 2d at 423.) Whether the doctor deviated from the standard of care and whether his conduct was a proximate cause of plaintiff's injury are questions of fact for the jury. *Borowski*, 60 Ill. 2d at 423.

It is improper for a trial court to enter a *j.n.o.v.* when there is a substantial factual dispute in the case, or when it is necessary to evaluate conflicting evidence in order to determine the outcome of the case. (*Connelly*, 184 Ill. App. 3d at 385.) This same standard is used by the reviewing court in determining whether the trial court applied the standard properly. (*Connelly*, 184 Ill. App. 3d at 386.) Accordingly, we will not enter a *j.n.o.v.* in a medical malpractice action when the jury has weighed conflicting expert testimony and determined that the essential elements of a medical malpractice case have not been sufficiently proved.

In order to prevail on this claim, plaintiff must show that the evidence overwhelmingly indicates Dr. Haydary breached his standard of care and caused injury to Patrice. The malpractice alleged here was Dr. Haydary's failure to diagnose and treat the cerebral edema (brain swelling), due to hyponatremia, that caused Patrice's death.

Experts for the plaintiff testified that the standard of care in this instance demanded that Dr. Haydary: (1) be aware hyponatremia is a known side effect of Pitocin; (2) proceed to the hospital upon learning of Patrice's condition from the nurses attending Patrice and from Dr. Robin; (3) recognize the possibility of hyponatremia in his diagnosis; (4) treat Patrice for hyponatremia; (5) properly administer Pitocin and not order it for too long a duration; and (6) evaluate Patrice's sodium level on an emergency basis.

■ We determine that, when viewed in the aspect most favorable to defendant, the defendant's case gives rise to a substantial factual dispute with respect to plaintiff's assertion of Dr. Haydary's duty and his compliance with that duty. Plaintiff asserts that Dr. Haydary should have known what was wrong with Patrice and he should have treated her for it. However, there was no general agreement between the experts as to how Patrice should have been treated. We distinguish the facts of the case at bar from those in *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 427, where the medical experts were in total accord as to the proper standard of medical care to be followed in the context of the facts. In *Carman*, the court held that when all the experts are in agreement on the proper standard of care, the *Pedrick* standard was met, a *j.n.o.v.* was proper, and the defendant/ doctor could be held liable for damage resulting from his actions

which did not conform to the undisputed standard of care. *Carman,* 63 Ill. App. 3d at 428.

The deciding issue in this case is whether Dr. Haydary's conduct fell below the accepted standard of care by failing to diagnose and treat Patrice for hyponatremia. Plaintiff's attempt to establish this standard of care failed, in part, because his counsel asked hypothetical questions that did not adequately address the adequacy of Dr. Haydary's diagnosis. Plaintiff's counsel's questioning at trial evoked testimony to the effect that *if* a patient is found to have hyponatremia, *then* it should be treated. All the experts unsurprisingly agreed on this point.

However, the dispute involves what Dr. Haydary's duty compelled him to do given Patrice's undiagnosed condition *at that time,* not whether a doctor, in general, should treat hyponatremia. The primary duty was to diagnose. It is only then that the adequacy of the treatment can be debated. If Dr. Haydary negligently diagnosed Patrice, then his treatment based on that diagnosis could be examined. Because medicine is a profession which involves the exercise of individual judgment within the framework of established procedures, differences in opinion are consistent with the exercise of due care. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 261.) We find that Dr. Haydary presented sufficient evidence to raise a factual issue that he acted with due care by exercising his individual judgment in diagnosing Patrice's problem and treating her accordingly.

The defendant provided expert testimony expressing opinions that Dr. Haydary carried out his responsibilities as a physician in a normal and acceptable manner and that he acted within the standard of care. One expert provided an opinion that it is a perfectly normal type of practice for a gynecologist to administer Pitocin to a woman prior to and following a D&C. The expert expressed an opinion that the dosage of Pitocin Patrice received over a 42-hour period was a minimal amount. He also expressed an opinion that Dr. Haydary met his obligations with regard to taking care of Patrice on the morning after the D&C procedure had been performed.

The expert further offered an opinion that Patrice's symptoms of nausea, vomiting, and headache could have been due to a mild viral infection, a gastroenteritis, a bowel problem, and, even more likely, to the lingering effects of coming out of the anesthesia she received. She also could have been responding negatively to the Demerol she received. In addition, Patrice had a long history of migraine headaches which, it was testified, are also associated with nausea and vomiting. The expert testified that there were probably over 100 different con-

ditions that could be associated with the headache, nausea, and vomiting that Patrice was experiencing. He said that of these diagnoses, he would put water intoxication (hyponatremia) at the very bottom of the list. Defendants' expert testified that based on the symptoms Patrice was experiencing at 11 a.m. on July 20, there was no need to perform an electrolyte test on Patrice. The expert expressed the opinion that Dr. Haydary did not violate his standard of care by calling for an internist to see Patrice, particularly in light of the fact that Dr. Haydary had just visited with her.

The expert also opined that putting Patrice on a general diet after the operation was an effective way to replace the electrolytes that were no longer being administered through the Ringer's solution, which was discontinued on July 19. Furthermore, there was testimony that Patrice received Pitocin in connection with an earlier pregnancy and that she suffered no ill effects from it.

Both Dr. Haydary and Dr. Robin ordered CBCs on July 20. Dr. Haydary's CBC was performed at approximately 1 p.m., and Dr. Robin's at about 4 or 5 p.m. Defendant's expert pointed out that the white blood cell count went up considerably from the first CBC to the second. He indicated that he would expect the white cell count to be diluted along with the red cell count had hemodilution taken place. In addition, the plaintiff brings out testimony that the absence of certain elements of the blood could indicate the presence of hyponatremia. However, experts for the defense pointed out that such figures could also reflect the loss of blood Patrice experienced both before, during and after her operation.

Defendants' experts further testified that Dr. Haydary applied the knowledge and used the skill and the care ordinarily used by a reasonably well-qualified obstetrician/gynecologist when Dr. Haydary sought the aid of an internist to evaluate Patrice when she developed her peculiar symptoms. The expert further testified about the possibility of Patrice's symptoms as being indicative of post-partum depression associated with pregnancy, and, thus, potentially a psychological problem.

We find that this evidence presented by the defense was sufficient to create a substantial question of fact concerning the elements of Dr. Haydary's standard of care and how his actions should have conformed to that standard. Viewing this dispute in the aspect most favorable to defendant, we cannot say that the evidence overwhelmingly favors plaintiff. Therefore, we hold that it was appropriate for the trial court to deny plaintiff's motion for a *j.n.o.v.*

Plaintiff next argues that he is entitled to a new trial because the jury's verdict was contrary to the manifest weight of the evidence. A jury verdict will not be disturbed on appeal unless it is against the manifest weight of the evidence. (*Nolan v. Elliott* (1989), 179 Ill. App. 3d 1077, 1081.) A verdict is against the manifest weight of the evidence when an opposite conclusion is clearly apparent or when the jury verdict appears to be arbitrary and unsupported by the evidence. (*Nolan*, 179 Ill. App. 3d at 1082.) A court of review must consider the evidence in the light most favorable to the appellee when determining whether a jury verdict is against the manifest weight of the evidence. *Nolan*, 179 Ill. App. 3d at 1082.

■ After examining the evidence in the case at bar, in the light most favorable to defendants, we cannot agree with plaintiff's contention that the verdict was against the manifest weight of the evidence. As we have discussed above, there is substantial evidence supporting the jury's verdict. Most notably, defendants' presentation of credible expert testimony on the standard of care and causation gave rise to a valid question of fact. In cases involving conflicting expert testimony, it may not be said the verdict is against the manifest weight of the evidence. *Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 222.

Plaintiff attempts to analogize the present case with *Casey v. Penn* (1977), 45 Ill. App. 3d 573, where an orthopedic surgeon failed to timely diagnose and properly prescribe antibiotics for an infection of a girl's arm which occurred subsequent to surgery. We find that the facts in *Casey* are distinguishable. In *Casey*, the defendant operated on the plaintiff's arm while swelling from the injury was affecting the surgical site. Defendant knew that the trauma from surgery would increase the swelling in that area and, thus, would reduce circulation in the arm. To compound the damage further, the defendant inappropriately applied a compressive bandage to control the swelling. In addition, the defendant did not examine the surgical site until four days later. At that time, it was quite apparent that plaintiff was suffering from an infection of the surgical wound. Plaintiff's arm had become greatly swollen, her fingers had turned blue and cold to the touch, her temperature exceeded 100 degrees for extended periods of time, and discharge was emitted from the wound which gave off a foul odor. The court noted that the threat of infection is always present when surgery is performed and it must be treated immediately so that it will not grow and spread. In light of the evidence that the defendant failed to take affirmative steps to cure the obvious danger of infection, the court held that the jury's verdict in favor of defendant was

clearly contrary to the manifest weight of the evidence, and a new trial was granted. *Casey*, 45 Ill. App. 3d 573.

In the present case, there is no contention that Dr. Haydary performed the surgery under improper circumstances. Further, Dr. Haydary was on hand the following morning in order to examine Patrice. There was also testimony indicating that Patrice's condition was difficult to diagnose and that her symptoms were indicative of many problems. Because Dr. Haydary attempted to diagnose and treat these problems, and because plaintiff did not overwhelmingly establish that such diagnosis and treatment failed to conform to the applicable standard of care, we find that the jury's verdict was not contrary to the manifest weight of the evidence.

Plaintiff finally argues that the trial court erred when it barred one of plaintiff's experts (Dr. Reines) from testifying as an expert witness at trial. Plaintiff asserts that he intended to use Dr. Reines' testimony against both Dr. Robin and Dr. Haydary and that the absence of this testimony prejudiced his case.

Plaintiff disclosed Dr. Reines as one of his experts on July 5, 1990, approximately 101 days prior to the scheduled trial date. On August 13, 1990, the court granted Dr. Robin's motion to bar Dr. Reines from testifying. The court subsequently denied plaintiff's motion to reconsider its order, refused plaintiff's offer of proof which was submitted at the close of plaintiff's case in chief, and rejected plaintiff's post-trial motion claiming error in the earlier rulings.

The trial court offered several reasons for its decision to bar Dr. Reines' testimony. First, the court stated that the order was premised upon the inherent authority of the trial court to limit and regulate the number of expert witnesses pursuant to Supreme Court Rule 218 (134 Ill. 2d R. 218). The court asserted that it may apply Rule 218 in order to expedite the efficient administration of justice and the disposition of trials by limiting the number of expert witnesses without regard to Rule 220. Second, the court indicated that there was no violation of Rule 220 when it barred the testimony in question. The court also stated that "the ruling was based on both Rule 220 and the long-standing inherent authority and supreme court rule authority of trial judges to control the number of witnesses within the sound exercise of judicial discretion, and on that same basis, the order of presenting them and so forth." Third, the court implied that the long pendency of the trial (almost seven years from the issuance of the complaint to the trial date) justified its ruling. The court further noted that the desired effect of using Dr. Reines was obtained by cross-examination of

the parties and other witnesses such that there was no prejudice to the plaintiff.

■ On appeal, plaintiff argues that the trial court was compelled to allow Dr. Reines to testify because he was disclosed as a witness 101 days before trial and, therefore, was in compliance with Rule 220. Plaintiff further argues that, because he complied with Rule 220, the trial court's partial reliance on Rule 218 was inappropriate. We find that neither the plain language of Rule 220 nor its relevant case law supports such an interpretation. We also find that the trial court's reliance upon both Rule 218 and Rule 220 could be sustained as a proper exercise of judicial discretion.

Supreme Court Rule 218 authorizes the court to consider "the limitation of the number of expert witnesses" in the context of pretrial procedures. (134 Ill. 2d R. 218(a)(4).) Furthermore, the rule requires that the trial court "make an order which recites any action taken by the court and the agreements made by the parties as to any of the matters considered" during a pretrial conference. (134 Ill. 2d R. 218(b).) The rule further provides that "[t]he order controls the subsequent course of the action unless modified." 134 Ill. 2d R. 218(b).

In the present case, the parties agreed to set March 18, 1988, as a discovery cutoff date. On February 22, 1988, the court issued an order reflecting this agreement. Furthermore, the court issued an order requiring that plaintiff's experts be disclosed and deposed by December 22, 1987. Dr. Reines was disclosed two years and seven months later, more than two years after defendants' experts had been presented for deposition. Following the plain language of Rule 218, the court could justifiably bar Dr. Reines from testifying because it was acting in accordance with its own order which served to limit the number of expert witnesses.

Plaintiff asserts that further discovery was conducted and that additional depositions were taken during 1990. Such an assertion implies that the parties waived their initial agreement setting a discovery cutoff date. However, discovery conducted after the cutoff date was done by further agreement of the parties. Moreover, plaintiff fails to recognize that the physicians deposed at the later dates were involved in the treatment of Patrice and, therefore, they were not testifying as Rule 220 experts. Our supreme court has held that treating physicians are not experts under Rule 220; rather, they are called as occurrence witnesses who testify because of their participation in the transaction. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226.) In *Tzystuck*, the court stated that "[t]here is no reason why a defendant

should be surprised by the medical testimony of a treating physician at trial." (*Tzystuck* (1988), 124 Ill. 2d at 238.) Because the testimony of the personnel who treated Patrice was discovered by agreement of the parties, and because both parties were well aware of the identity of these individuals, there was no surprise resulting from their participation in the trial.

Plaintiff next asserts that the trial court was required to permit Dr. Reines to testify because his disclosure fell within the discovery limits imposed by Rule 220.

Supreme Court Rule 220 provides, in relevant part:

> "[A]s to all expert witnesses not previously disclosed, the trial court, on its own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, including rebuttal experts, shall be disclosed. *** All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence." 134 Ill. 2d R. 220(b)(1).

"The purpose of the rule is to facilitate trial preparation by eliminating last-minute disclosure of expert witnesses." (*Vallejo v. Mercado* (1991), 220 Ill. App. 3d 1, 7.) The rule addresses this evil by establishing a uniform, but not inflexible, framework for the timely revelation of experts and their proposed testimony. (*Vallejo*, 220 Ill. App. 3d at 7-8.) The rule explicitly requires that the parties seasonably "ascertain the identity of such witnesses" and "obtain from them the opinions upon which they may be requested to testify." (134 Ill. 2d Rules 220(b)(1)(i), (b)(1)(ii).) In addition, the Committee Comments emphasize that a "timely and conscientious effort to comply [with Rule 220] is required." 134 Ill. 2d R. 220, Committee Comments, at 180.

■ We find that the trial court's decision to bar the testimony of Dr. Reines was not an abuse of its discretion and was not contrary to the provisions of Rule 220. Rule 220 sets forth requirements which dictate when the discovery of experts must be completed. However, the language of the rule presents no obstruction to the imposition of a disclosure schedule which precedes the 60-day period before the trial. (*Castro v. South Chicago Community Hospital* (1988), 166 Ill. App. 3d 479, 482.) In addition, Rule 220 authorizes the trial court to bar the testimony of any expert not disclosed under that schedule. (*Castro*, 166 Ill. App. 3d at 482.) Rule 220 provides that "[f]ailure to make the disclosure required by this rule or to comply with the discovery con-

templated herein will result in disqualification of the expert as a witness." 134 Ill. 2d R. 220(b)(1).

From our discussion above, it can be seen that, while Rule 220 establishes deadlines for the discovery of an expert, a court may, in its discretion, set its own cutoff dates for the disclosure and discovery of expert witnesses. Moreover, the court may bar the testimony of an expert whose disclosure does not comply with the court-set deadlines. Finally, notwithstanding Rule 220, a court may exercise its discretion under Rule 218 in order to limit the number of expert witnesses at trial. Therefore, we hold that the trial court did not abuse its discretion when it applied both Rule 218 and Rule 220 to support its decision to bar the testimony of Dr. Reines.

Plaintiff next contends that the order barring the testimony of Dr. Reines prejudiced his case against Dr. Robin and Dr. Haydary.

■ First, plaintiff alleges that the forced absence of Dr. Reines left him without an expert to testify against Dr. Robin. If this allegation were true, we would seriously consider remanding the case for a retrial. However, defendants filed a motion which was taken with the case asking this court to amend the record with deposition transcripts of Dr. Bird and Dr. Klawans, plaintiff's other two experts. When viewed in light of these transcripts, the representation that only Dr. Reines was prepared to testify against Dr. Robin is shown to be patently false. Defendants' motion was made pursuant to Supreme Court Rule 329. (134 Ill. 2d R. 329.) Under Rule 329, this court may order any corrections in the record that will aid in the presentation of questions on appeal. (*Phelps v. O'Malley* (1989), 187 Ill. App. 3d 150, 152.) Accordingly, we grant defendants' motion to amend the record and note that the paucity of evidence against Dr. Robin was due to the type of questions asked by plaintiff's counsel during trial rather than the absence of Dr. Reines.

Second, plaintiff asserts error in barring the testimony of Dr. Reines because such testimony was essential to show (1) that Dr. Haydary negligently administered Pitocin to Patrice and improperly diagnosed and treated her problem, and (2) that defendant's theory that Patrice died of a cause unrelated to Pitocin was not supportable.

We find that the testimony Dr. Reines had to offer on the proper use of Pitocin and the proper diagnosis and treatment of Patrice would have been cumulative. Since plaintiff's other experts provided significant credible testimony on these issues, it was not an abuse of discretion for the trial court to bar the testimony of Dr. Reines.

Plaintiff also intended to use Dr. Reines' testimony to rebut defendants' theory that Patrice's death was the result of a cause un-

related to the use of Pitocin. One of defendants' experts, Dr. Arieff, testified that Patrice's death had nothing to do with the Pitocin in her system. As a doctor of internal medicine, he testified that Patrice's death was the result of an atypical biochemical response to the D&C procedure. Dr. Reines, a surgeon, would have testified that this atypical response could not have been the cause of death in Patrice's case. We fail to find prejudice as a result of the absence of Dr. Reines' testimony on this issue. The atypical biochemical response to the surgery described by defendants' expert would simply have been an alternate cause of the hyponatremia Patrice suffered. This point was recognized by counsel for plaintiff who eloquently argued in his closing statements that the theory posited by Dr. Arieff need not be refuted because Patrice "clearly had hyponatremia from whatever cause and it was treatable and it was not treated." The duty to treat hyponatremia was adequately set forth by plaintiff's other experts. Therefore, the trial court did not abuse its discretion in barring the testimony of Dr. Reines.

A court should generally avoid barring an expert witness from testifying if to do so would deny a party a trial on the merits. (*Andrews v. Northwestern Memorial Hospital* (1989), 184 Ill. App. 3d 486; *Schaefer v. Sippel* (1978), 58 Ill. App. 3d 816, 819.) However, it may do so where a litigant fails to comply with a court order imposing an affirmative obligation to disclose experts. (*Castro*, 166 Ill. App. 3d 479; *James v. Yasunaga* (1987), 157 Ill. App. 3d 450.) Moreover, summary judgment may even be proper in situations where a delay in the disclosure of an expert was not adequately explained. *Mitchell v. Wayne Corp.* (1989), 180 Ill. App. 3d 796.

In *Vallejo*, we held that the trial court abused its discretion in barring the testimony of the plaintiff's expert even though disclosure came less than 60 days before trial. (*Vallejo*, 220 Ill. App. 3d at 10.) Of primary importance in arriving at this determination was the fact that the plaintiff provided an explanation for the delay in securing an expert witness on the issue of negligence. In addition, the plaintiff requested a continuance of the trial date to allow him additional time to conduct discovery.

In the present case, plaintiff was neither denied a trial on the merits nor was he denied the ability to prove an essential element of his case. In addition, plaintiff's disclosure of Dr. Reines came more than six years after the initial complaint against the defendants, and plaintiff never explained his delay in obtaining Dr. Reines as an expert. His argument that the trial judge made a statement during a hearing that discovery was still open does not explain why it took him

over two years to find an expert to respond to the theories embraced by the defense. Furthermore, we see no evidence that circumstances changed (see *Cometo v. Foster McGaw Hospital* (1988), 167 Ill. App. 3d 1023) or that evidence was finally obtained (see *Vallejo*, 220 Ill. App. 3d at 14) such that a continuance would have been necessary in order to allow for the use of additional expert testimony. Finally, the trial court ordered cutoff dates for the disclosure and deposition of experts. Plaintiff presents no argument that these deadlines were unfair or unduly burdensome.

The decision to allow or exclude expert testimony is a matter within the sound discretion of the trial court. (*Appelgren v. Walsh* (1985), 136 Ill. App. 3d 700, 703.) The discretion given to the trial court in this area is broad and will not be interfered with unless it appears that it has been abused. (*Appelgren*, 136 Ill. App. 3d at 705.) In light of our discussion above, we hold that the trial court did not abuse its discretion in barring the testimony of Dr. Reines.

■■ We further affirm the directed verdict granted in favor of Dr. Robin. Verdicts should be directed only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510.) This same standard is applied by the reviewing court. *Pedrick*, 37 Ill. 2d at 511-12.

In the present case, when the evidence is viewed in the light most favorable to plaintiff, the opponent to the directed verdict, the directed verdict must stand. Plaintiff's sole argument in opposition to the directed verdict is that the forced absence of Dr. Reines denied him the opportunity to present a case against Dr. Robin. However, as stated above, the trial court did not abuse its discretion in barring the testimony of Dr. Reines. In addition, it is apparent from the amended record that plaintiff could have used his other two experts to prove a case against Dr. Robin but simply chose not to do so. Therefore, the entry of a directed verdict by the trial court in favor of Dr. Robin was proper and will not be reversed. In sum, because plaintiff failed to present any evidence against Dr. Robin, no contrary verdict could ever stand.

■■ Finally, we address defendants' joint motion to strike plaintiff's statement of facts. Defendants contend that plaintiff's statement of facts contains argument and comment in violation of Supreme Court Rule 341(e)(6). (134 Ill. 2d R. 341(e)(6).) Although plaintiff's statement of facts contains argument and comment, it complies with Rule 341(e)(6) in other respects by making reference to the record and

by setting forth other fairly innocuous representations of fact. Where violations of the supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted. (*James*, 157 Ill. App. 3d at 452.) Therefore, the motion to strike is denied. We note, though, that inappropriate argument in the statement of facts tends to weaken rather than strengthen an advocate's persuasiveness.

For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

WOODWARD and INGLIS, JJ., concur.