(No. 47724.—

## ROBERT H. LAWSON, Adm'r, *et al.,* Appellees, v. G. D. SEARLE & COMPANY, Appellant.

*Opinion filed Oct. 1, 1976.—Rehearing denied Nov. 12, 1976.*

UNDERWOOD, J., took no part.

Baker & McKenzie and Sidley & Austin, both of Chicago (Francis D. Morrissey, Thomas F. Tobin, John T. Coleman, Edward J. Zulkey, William P. Richmond, and James W. Kissel, of counsel), for appellant.

James A. Dooley, of Chicago, for appellees.

MR. JUSTICE RYAN delivered the opinion of the court:

This action was filed in the circuit court of Cook County to recover damages for the death of Sarah Lawson and for injuries sustained by Joanne Holmes allegedly resulting from their use of defendant's contraceptive drug Enovid. The action was one of strict liability in tort. The jury returned verdicts in favor of defendant. The trial lasted for seven weeks and was vigorously contested with both sides presenting extensive evidence, including considerable expert testimony. The trial record alone consists of nearly 6,000 pages.

The appellate court reversed and remanded for a new trial on all issues, with one justice dissenting. (29 Ill. App. 3d 670.) The majority determined that the jury's verdicts were against the manifest weight of the evidence. It also found that various trial errors required reversal. We find the jury's verdicts supported by substantial evidence, and that the trial errors committed were not sufficiently prejudicial as to require reversal. Consequently we reverse the appellate court.

Mrs. Lawson was 25 years old, overweight, and the mother of five children in July, 1962, when Enovid was first prescribed to correct menstrual difficulties. The prescribing physician next saw her on August 20, when she entered the hospital emergency room suffering from pain in the upper quadrant of her abdomen. She was discharged from the hospital nine days later without any symptoms. She returned to the hospital on September 1. On September 4 a clot obstructed a large vein in her leg, resulting in

massive swelling of the leg. She died the next day due to multiple pulmonary emboli.

Mrs. Holmes began taking Enovid in September, 1963. In December she noticed shortness of breath, numbness in her arm and fingers, and a pain in her right shoulder. She was admitted to the hospital on December 10, 1963. She was treated with anticoagulants, hot towel packs, and leg wrappings, and was released from the hospital on January 9, 1964.

The issues presented before this court are: (1) whether the jury's verdicts in favor of defendant are against the manifest weight of the evidence; (2) whether defendant's exhibit No. 45 was properly admitted into evidence and properly submitted to the jury; (3) whether the testimony of defendant's expert, Dr. Drill, was improper because based on inadmissible hearsay; (4) whether defendant complied with certain discovery orders pursuant to Supreme Court Rule 237; and (5) whether alleged trial misconduct by defendant's counsel requires reversal.

Considering first the question of the manifest weight of the evidence, we note the instructions that were given to the jury on the theory of strict liability. Plaintiffs' instruction No. 15 stated:

> "The plaintiffs, and each of them, have the burden of proving each of the following propositions:
>
> First, that the condition of Enovid was unreasonably dangerous;
>
> Second, that the condition of Enovid existed at the time it left the control of the defendant;
>
> Third, that the condition of Enovid was a proximate cause of the condition of ill-being complained of in each case."

Also given was court's instruction No. 1 as follows:

> "A product faultlessly made may be deemed to be unreasonably dangerous if it is not safe for such a use that is to be expected to be made of it and no warning is given."

The directives of these instructions constitute the stand-

ards against which the jury was to measure the evidence relating to plaintiffs' right to recover under the theory of strict liability. Special interrogatories were not submitted and general verdicts were returned, so we do not know which element contained in these instructions the jury concluded relieved defendant of liability.

The evidence was conflicting. That presented by the defendant indicated that thromboembolic episodes could occur idiopathically and that the incidence of thromboembolic episodes increases with such factors as parity, obesity, vascular abnormalities, and restricted movement. Further, Drs. Winter, Isaacs, and Drill, testifying for defendant, expressly stated that there was no relationship between the use of Enovid and the occurrence of thrombophlebitis or pulmonary emboli. Similar testimony was elicited from defendant's other expert witnesses. Plaintiffs' witnesses reached opposite conclusions. Plaintiffs argued that various case reports and clinical studies showed conclusively that there is a causal relationship between Enovid use and thromboembolic disorders.

We agree that the manifest weight of the evidence supports plaintiffs' position on this issue and rebuts defendant's contention that there is no relationship between the use of the drug Enovid and the occurrence of thrombophlebitis. If this were the only issue resolved by the general verdicts, we would conclude, as did the appellate court, that the verdicts are against the manifest weight of the evidence.

However, even if the jury did find that defendant's product may cause blood clotting, under the instructions given, the jury could have refused to find that use of the drug was the proximate cause of the injuries involved in this case. There is credible evidence in the record which, if believed by the jury, would show that Mrs. Lawson's death was a result of predisposing causes, and that Mrs. Holmes' injuries did not result from a pulmonary embolism.

As noted earlier, evidence was presented which would

establish that the incidence of thromboembolic episodes increases with such factors as parity, obesity, vascular abnormalities, and restricted movement. All of these factors were present in Mrs. Lawson's case. She had given birth to five children and was considerably overweight. Defendant's witness, Dr. Buckingham, stated that he believed that the prior pregnancies were the proximate cause of the pelvic vein thrombophlebitis. The autopsy revealed the presence of recanalized blood clots in the pelvic region. The jury could have believed, as defendant urged, that these clots existed prior to her use of Enovid and indicated prior vascular abnormalities or disorders. Mrs. Lawson spent nine days in the hospital during the weeks before her death. The jury could have believed that the bed rest and restricted movement during her hospital stay were a contributing factor to her thromboembolism. The doctor who performed the autopsy testified that he found blood clots in various parts of the body. Some clots were only a few days old; others may have been as much as six to eight weeks old. Although plaintiffs presented evidence which could detract from the weight of the conclusions drawn by defendant's expert witnesses, the questions of the credibility of the witnesses and weight to be given to their testimony were peculiarly within the province of the jury. Under the evidence presented, a verdict for the defendant based on the proximate cause of the illness and Mrs. Lawson's death would not be contrary to the manifest weight of the evidence.

Concerning Mrs. Holmes, there was a dispute at trial as to the exact nature of her illness. Dr. Aries, plaintiff's witness, testified that an X ray of Mrs. Holmes indicated that she had suffered an infarct in the right lower lobe of her lung. In response to a hypothetical question, he testified that "such a hypothetical person could have sustained an embolus to the right lung most likely originating from the pelvis or from the extremities." On cross-examination, however, Dr. Aries admitted that a

condition of pneumonitis would also be consistent with his view of the X ray. Dr. Buckingham, defendant's pulmonary function witness, testified that Mrs. Holmes' condition indicated "a pleural pneumonia rather than a pulmonary embolus." Dr. Isaacs, also defendant's witness, testified that the hypothetical question indicated "either a pleuresy or a pneumonitis rather than a pulmonary embolus." Thus there was credible evidence from which the jury could have concluded that Mrs. Holmes' condition did not involve a pulmonary embolism and was not caused by ingestion of defendant's drug.

The court's instructions quoted above told the jury that Enovid could be considered unreasonably dangerous if "it is not safe for such a use that is to be expected to be made of it and no warning is given." This instruction parallels certain comments to section 402A of Restatement (Second) of Torts (1965). Comment *h* to that section states that a "product is not in a defective condition when it is safe for normal handling and consumption," but where the seller "has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger \*\*\*, and a product sold without such warning is in a defective condition." Comment *i* states: "Many products cannot possibly be made *entirely* safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption." (Emphasis added.) Comment *k* provides:

> "*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. \*\*\* Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to

physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis in comment.)

Thus, as indicated in the comments, the question of the adequacy of the warning given in strict liability cases involving drugs may be the central issue in determining whether the product is unreasonably dangerous within the concept of strict liability as set forth in section 402A of the Restatement. Therefore, under the court's instruction, even if the jury determined that the use of the drug Enovid involved some degree of risk it could have decided that the manufacturer's warning prevented the drug from being considered unreasonably dangerous.

Since both plaintiffs had stopped using Enovid prior to the end of 1963, only the warnings given before that time are relevant. In a letter dated August 7, 1962, the defendant warned all physicians in the country of reported incidents of thromboembolic disease among Enovid users. The letter stated in part:

"IMPORTANT—DRUG CAUTION

Dear Doctor:

We are addressing this letter to you in keeping with our policy of bringing to you all of the pertinent facts concerning our products and as a response to recent publicity dealing with the occurrence of thromboembolic phenomena coincident with women receiving Enovid.

Since its introduction there have been reported to us as of this date 28 cases of thrombo-embolic disease in the

more than one million users of Enovid in the United States. Among these were 10 cases of pulmonary embolism, 5 of which were fatal. In addition, there are press reports of 4 cases, including 1 death from the United Kingdom.

In some of these one or more of the usually accepted inciting causes of thrombophlebitis were evident; in some they were not.

Reports to the manufacturer do not reflect the accurate incidence of reactions and the available statistics are not adequate to determine whether or not there is a causal relationship, but caution requires consideration of this possibility.

It must be remembered that pulmonary embolism can occur without discernible inciting cause and without preceding peripheral thrombophlebitis. Nevertheless, careful studies by investigators experienced in the measurement of the extremely complex factors involved in the clotting mechanism are continuing, including an evaluation of the role of fluid accumulation sometimes seen after Enovid administration. This will be reported in a technical bulletin at an early date. At the present time the available laboratory data neither prove nor disprove a causal relationship between Enovid administration and the occurrence of thrombophlebitis.

The cases of thrombophlebitis reported to us have usually occurred early in the course of Enovid administration and at the lower dosage level. Experience based on patients taking Enovid at higher doses has not demonstrated any dose response relationship.

Physicians should be as alert to the possible occurrence of thrombophlebitis in patients to whom Enovid is prescribed as they are in patients taking other medication.

The above facts should be given particular attention if Enovid is considered for administration to patients with thrombotic disease or a history of thrombophlebitis.

We request that any thrombo-embolic occurrence in women receiving Enovid be reported to us and to the Food and Drug Administration.

Sincerely yours,
/s/ Irwin C. Winter
Irwin C. Winter, Ph.D., M.D.
Vice President
Medical Affairs"

Additional letters (December 26, 1962, and August 7, 1963) were mailed to all physicians before Mrs. Holmes began taking Enovid. Thus, there was sufficient evidence in the record from which the jury could have concluded that a warning was given to the physicians as to the possible risks of Enovid use and that the warning was sufficient.

In summary, we find that the jury could justifiably have found that Enovid did not proximately cause the injuries involved here or that a proper warning of the possible risks of use of the drug was given. Each of these permissible findings is supported by sufficient credible evidence in the record. If the jury made either of the above findings, verdicts for defendant would be required.

It is the jury's function to determine the preponderance of the evidence, and a reviewing court will reverse only if this determination is against the manifest weight of the evidence. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 451.) After a careful review of the entire record, we cannot say that the jury's verdicts are manifestly erroneous. Therefore, we must now consider the alleged trial errors.

Plaintiffs' first assertion of trial error concerns defendant's exhibit No. 45, a document entitled the "Second Report on the Oral Contraceptives." The booklet was compiled by the Food and Drug Administration's Advisory Committee on Obstetrics and Gynecology in 1969. It is first argued that this report, although sent to the jury, was never admitted into evidence. It appears that the defendant had offered three separate committee reports into evidence. Defendant's exhibit No. 41 was a 1963 committee report. Defendant's exhibit No. 43 was a 1966 committee report and defendant's exhibit No. 45, the one in question, was a 1969 committee report. Plaintiffs' counsel had objected to the 1963 report (defendant's exhibit No. 41) as being obsolete and superseded by later reports. During the lengthy discussion concerning the admission of these documents, the court indicated that the

defendant was entitled to have one, but not all, of these reports admitted into evidence. The dissenting justice in the appellate court reviewed the colloquy between the court and counsel and concluded that defendant's exhibit No. 45 had been admitted into evidence (29 Ill. App. 3d at 692-95). It is unnecessary for us again to recite these court proceedings in this opinion. The trial court was satisfied that it had admitted this exhibit, and we do not find this conclusion to be error.

The more serious questions concerning exhibit No. 45 are whether it was error to admit this exhibit into evidence and once admitted whether it should have been taken to the jury room.

The jury was made aware of the existence of the 1969 report (exhibit No. 45) by the many references to it during the trial. One conclusion contained in the report was very beneficial to the plaintiffs' position. In his opening statement to the jury, plaintiffs' counsel informed it of this conclusion by stating:

> "in 1969, the FDA appointed a committee headed by a Dr. Hellman, and that committee came to the conclusion that insofar as causal relationship between Enovid and thromboembolic disorders, the question was no longer open for debate."

Again, in the examination of plaintiffs' expert witness Dr. Hillabrand, plaintiffs' counsel inquired about the 1969 report and that part of the report referring to the studies and the conclusion supportive of plaintiffs' position. Plaintiffs' counsel also incorporated in a hypothetical question to Dr. Hillabrand reference to the 1969 report and the conclusion favorable to plaintiffs that it was no longer debatable that there was a relationship between oral contraceptives and thromboembolic disorders. On redirect examination of Dr. Hillabrand, in showing that there was a change in the defendant's literature concerning Enovid following the 1969 report, plaintiffs' counsel again referred to the report and its conclusion. Later during the

continued redirect examination of this witness, plaintiffs' counsel read at length (2 pages of the transcript) from the report concerning the relative risks of thromboembolism among users of oral contraceptives as against nonusers. The part of the report read included the statement that the "incidence of thromboembolism in pill users was 4.4 times the incidence in people who were not using oral contraceptives."

Plaintiffs claim that admission of defendant's exhibit No. 45 was prejudicial because of certain statements made therein which indicated that no drug can be made absolutely safe and that evaluating "safety" involves weighing benefit against risk. The part of the exhibit which offends plaintiffs states:

> "Although the Kefauver-Harris Amendments of 1962 indicate that the term 'safe' has reference to health of man, nowhere do they define safety. Discussing this subject before the Subcommittee of the Committee on Government Operations of the House of Representatives, the Commissioner of FDA pointed out that no effective drug can be absolutely safe. Therefore, evaluating safety of a drug requires weighing benefit against risk.
>
> The Advisory Committee on Obstetrics and Gynecology has continued to assess the risk of oral contraceptives in this light, weighing knowledge of potential hazards against benefit. It has periodically reviewed the labeling of these compounds, repeatedly advocated strict surveillance by physicians, and recommended the accumulation of additional information about biological action and clinical effects. This report states the benefits of these compounds compared with those of other contraceptives.
>
> Specific risks as well as requisite practices for followup of patients have been detailed in the labelling of all hormonal contraceptives. When these potential hazards and the value of the drugs are balanced, the Committee finds the ratio of benefit to risk sufficiently high to justify the designation safe within the intent of the legislation."

The plaintiffs argue that while these statements may be medically correct, they have no legal meaning.

It is true that the portion of exhibit No. 45 of which plaintiffs complain may be detrimental to their case. However, plaintiffs should not be permitted to extract from the report only that preliminary conclusion which is beneficial to their position and to withhold from the consideration of the jury the further conclusion of the committee concerning the continued use of the drug in light of the known risks. It is well established that if one party introduces part of an utterance or writing the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury. (7 Wigmore, Evidence sec. 2094, 2113 (3d ed. 1940); McCormick, Evidence sec. 56 (2d ed. 1972); 18 Ill. L. & Pr. *Evidence* sec. 243 (1956); see Fed. R. Evid. 106.) This court has recognized and applied this accepted evidentiary principle. (*Hamlin's Wizard Oil Co. v. United States Express Co.* (1914), 265 Ill. 156, 160; *Norton v. Clark* (1912), 253 Ill. 557; *Morris v. Jamieson* (1903), 205 Ill. 87.) We find no error in the introduction of the objected-to part of this exhibit.

We agree that exhibit No. 45 should not have been sent to the jury room, but we do not consider this error to be reversible. The exhibit is 88 pages in length and contains considerable material irrelevant to the issues in this case. The preferred procedure would have been to have the relevant portions of the exhibit read to the jury. Plaintiffs have not shown how they were prejudiced by the submission to the jury of the irrelevant content of this exhibit. We, therefore, do not consider this to be reversible error.

Plaintiffs next argue that there was error in certain testimony by defendant's witness Dr. Drill, an employee of Searle. The doctor had collected published clinical reports based on 15 large-scale studies and 53 small-scale studies and had prepared charts based on these studies. The charts were objected to by plaintiffs' counsel and the court

disallowed their use. On direct examination, Dr. Drill was allowed to state his opinion that there was no relationship between the use of Enovid and the occurrence of thrombophlebitis. He then testified that:

> "I base my opinion on my experience and making such evaluations, a detailed study of all the clinical studies that have been published in the literature relative to the incidence of thromboembolic disease in patients receiving oral contraceptives and in patients not receiving oral contraceptives."

The plaintiffs did not object to the giving of this opinion by the witness, but they did object later to this witness' reference to the studies and reports.

It should be noted that Dr. Drill did not mention the reports by name, nor did he recite the empirical data drawn from the reports or the conclusions of the researchers. He referred to these studies and reports as "published clinical studies." These studies represent a great mass of factual information much broader in scope than any one doctor or research team could hope to assemble. These studies are clearly a part of the scientific or professional literature which the witness could properly consider in forming his opinion. In 3 Wigmore, Evidence, sec. 687 (Chadbourn rev. ed. 1970), at page 3, it is stated:

> "Medical science is a mass of transmitted and collated data from numerous quarters; the generalizations which are the result of one man's personal observation exclusively are the least acceptable of all. The law must recognize the methods of medical science. It cannot stultify itself by establishing, for judicial inquiries, a rule never considered necessary by the medical profession itself. It is enough for a physician, testifying to a medical fact, that he is by training and occupation a physician; whether his source of information for that particular fact is in part or entirely the hearsay of his fellow-practitioners and investigators is immaterial ***."

We do not consider Dr. Drill's testimony as a recitation of hearsay evidence. He had testified as to his medical opinion. (See Fed. R. Evid. 703; *Sheats v. Bowen*

(D. Del. 1970), 318 F. Supp. 640.) He could have been cross-examined as to that opinion in light of the professional literature from which he formed that opinion as well as other relevant medical literature. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326.) We note in the record that he was extensively cross-examined along this line.

Plaintiffs next contend that defendant failed to comply with the order for discovery of certain materials under our Rule 237 (58 Ill. 2d R. 237). Plaintiffs assert that they were prejudiced by the defendant's failure to produce certain publications and correspondence. Several lengthy conferences were held on the discovery motion. The plaintiffs' motion requested that the production order cover correspondence and publications through the year 1970. During the trial there was a dispute as to whether plaintiffs' counsel had agreed to have the order cover only correspondence and publications through the year 1968. The court found that the plaintiffs' counsel had agreed to this limitation. There is sufficient evidence in the record to support this conclusion. The order as limited was complied with. We find no merit to this contention.

The plaintiffs raise several additional trial errors, including: (1) the improper impeachment of Dr. Hillabrand; (2) questioning a plaintiff's doctor about a physical condition of plaintiff which did not exist; (3) defendant's repeated offering of inadmissible exhibits; and (4) allowing too broad an examination of defendant's final expert witness. We have examined the record concerning these alleged errors and we find the contentions concerning them to be without merit, or in cases where there is substance to the contention the error was not prejudicial.

The record discloses minor improprieties by both sides during the course of the trial. This was a lengthy, complex and difficult trial, and both sides were represented by experienced and forceful attorneys. In ruling on plaintiffs' post-trial motions, the trial court stated that "although

there probably existed error in the conduct of the counsel and the rulings in the conduct of the entire trial, \*\*\* the court feels that taking the trial as a whole, it was a fair trial, and for the court to grant any of the relief requested by plaintiffs \*\*\* would be an erroneous intrusion on the jury's deliberated verdict." We agree with the trial court's assessment of the trial and with its conclusions.

Plaintiff is not entitled to an absolutely error-free trial. (*Genslinger v. New Illinois Athletic Club* (1928), 332 Ill. 316, 319.) "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." (*Both v. Nelson* (1964), 31 Ill. 2d 511, 514.) The trial taken as a whole was fair, and none of plaintiffs' allegations of error merit reversal of the jury's verdict. The appellate court decision is reversed. The judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE UNDERWOOD took no part in the consideration or decision of this case.