MANUEL CALDERON, Plaintiff-Appellant, v. ECHO, INC., Defendant-Appellee.

First District (5th Division)   No. 1—90—2515

Opinion filed March 19, 1993.

Thomas R. Cirignani & Associates, of Chicago (James C. Harman, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (R. Bruce Duffield and Hugh C. Griffin, of counsel), and Eugene V. Stahnke, of Echo, Inc., of Lake Zurich, for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff filed this products liability action after being struck in the eye by a flying object while operating a trimmer manufactured by defendant. In his complaint, plaintiff alleged that the safety shield on the trimmer was not adequate to protect the operator against objects thrown back at the operator and that defendant had failed to warn of the lack of protection offered by the safety shield. A jury awarded plaintiff, who lost use of his right eye in the accident, $253,742.70 in damages, but reduced the award 90% finding that plaintiff's failure to wear eye protection when operating the trimmer constituted an assumption of the risk. Plaintiff appeals contending that the jury's finding that he assumed the risk is against the manifest weight of the evidence.

FACTS

Plaintiff was injured on September 21, 1982, while working as a landscaper. He was operating the Echo Trimmer-Brushcutter, SRM 200AE (trimmer) when he was struck in his right eye by an object propelled by the trimmer. Plaintiff filed a products liability action against the trimmer's manufacturer, Echo, Inc. (Echo), alleging that the weed trimmer was in an unreasonably dangerous condition when put in the stream of commerce because its safety shield was inadequate to protect the user from flying objects, lacked proper warnings on the device itself, and used a material in manufacturing that chipped and cracked easily. Defendant Echo subsequently filed a third-party complaint against plaintiff's employer, A.R.T. Fleet Service (Fleet), seeking indemnification or, in the alternative, contribution based on Fleet's alleged failure to properly instruct plaintiff on the use of the trimmer.

In its answer, Echo raised the affirmative defense that plaintiff's injuries were caused, in whole or in part, by the comparative fault of plaintiff in that he failed to wear eye protection when using the trimmer. A jury trial was held. The trial testimony relevant to this appeal is set forth below.

Plaintiff called Richard VerHalen as an expert witness. Among other things, VerHalen testified that the trimmer's operator's manual

was extremely confusing and did not explain the nature and magnitude of the equipment and the potential dangers in its use. He stated that although the operator's manual explicitly states that eye protecting glasses should be worn whenever the unit was operated, the warning was not sufficiently emphasized. He also stated that the shield was inadequate and gave the user a false sense of security. On cross-examination, he conceded that the instruction to wear eye protection was on the first page of the operator's manual and that the trimmer itself contained a caution sticker on the bottom of the handle which says "Always wear eye protection."

Plaintiff Manuel Calderon testified that he was born in Mexico. He stated that he had a sixth-grade education in Mexico and came to the United States in 1968 when he was 20 years old. Plaintiff testified that his first job in this country was at a tree nursery where he worked for approximately seven years, planting trees and bushes. He then worked at a nut manufacturer for approximately nine years.

Plaintiff stated that he went to work for A.R.T. Fleet, a landscaping service, in 1981. He stated that on September 21, 1982, he was cutting grass in a 7- to 11-foot ditch. He was using the Echo trimmer equipped with a steel blade which he used about once a week to cut big weeds or tall grass. He stated that he had never used a trimmer prior to working for Fleet in 1981 and that a Fleet foreman, Charles Butterfield, taught him its use. He stated that Butterfield did not teach or tell him to use any special equipment when operating the cutter.

He testified that he was using the trimmer in the ditch when he got something in his eye. Butterfield, who was working close by, came over and asked what was wrong and plaintiff told him. Plaintiff denied that he told Butterfield at this time that he forgot to wear his glasses. Plaintiff said that at the time of the accident he was not wearing any safety glasses, that he did not own any safety glasses, and that he did not recognize those safety glasses which were offered as an exhibit at trial. He said that his co-workers did not use eye protection when operating the trimmer and that he had never worn safety glasses when using the trimmer in the two years he worked for Fleet. He wore sunglasses when he started to work for the tree service, but stopped wearing them because it was hot. He stated that no one from Fleet ever provided him with eye protection and that he was never told to wear eye protection when he worked.

Plaintiff testified that he did not know prior to his injury that the safety shield would not protect him from an eye injury; he thought it was to keep pieces of debris from flying backwards at him. He said

that he never saw an operator's manual for the trimmer and that he could not read English at the time of the accident. He never saw the caution labels, indicating that when the machine was used, the area where the labels were located would become oily and covered with grass.

On cross-examination, plaintiff stated that the trimmer would throw out cut grass at about knee level on both sides of the cutter and that the only time he was injured using the machine was when he lost his eye. He admitted that prior to his employment at Fleet, he operated a machine for the nut manufacturer and that he wore safety glasses provided by his employer when operating this machine. He acknowledged that he used the trimmer between 14 and 20 times prior to the accident.

Plaintiff then called Lee Sancken, the head of Fleet, pursuant to section 2—1101 of the Illinois Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1101.) Sancken admitted that there was no policy that employees read an operator's manual before using the trimmer, but stated that he instructed plaintiff on how to use the trimmer. Sancken conceded that he did not make sure employees wore their safety glasses, but stated that he did check from time to time to see whether the employees were wearing eye protection. Sancken admitted that when he used the trimmers, he wore no specific equipment, just his regular glasses. He stated that he bought goggles and safety glasses for the men and gave each person a pair and that any lost pairs were replaced immediately. He also testified that the cutter had a label instructing eye protection be worn and that while there might be some dirt on the handle of the trimmer, the handle would not be covered with grease and oil.

On cross-examination, Sancken asserted that he had at least 24 pairs of safety glasses or goggles which were kept in tool boxes, the shop and in the trucks. He also said that the foremen were required to make sure the workers were wearing eye protection and that all of his employees wore eye protection when operating the trimmer. He purchased proper eye protection especially for the trimmers after reading the operator's manual, which stated that such protection should be worn.

Sancken testified he saw the plaintiff operating the trimmer and using eye protection on many occasions and that the one time he saw plaintiff using the trimmer without eye protection, he stopped plaintiff and told him to put on his safety glasses. Sancken stated that he would hold discussions with plaintiff in English and that he thought

plaintiff could read English because he gave him written instructions which plaintiff would then perform.

Defendant Echo's first witness was Charles Butterfield, who testified that on the date of the accident he was a crew foreman for Fleet. Butterfield said that he had trained plaintiff how to use the trimmer and that the first thing he discussed with plaintiff was eye protection, telling him that every time the trimmer was used plaintiff had to wear eye protection. Butterfield observed plaintiff use the machine after training, and noted that plaintiff, who used either safety glasses or goggles most of the time, wore them all the time when he used the trimmer. According to Butterfield, plaintiff never refused to wear eye protection and all of the employees always used eye protection when operating the trimmer. He testified that plaintiff did not give him any indication that he did not understand his directions and said that he and plaintiff spoke to each other in English.

Butterfield reminded everyone on the day before the accident to wear their safety glasses because the next day's job involved uneven surfaces. Butterfield stated that after taking plaintiff to the hospital, he asked him how the accident happened; plaintiff responded that he was not wearing any eye protection because he had forgotten his safety glasses. According to Butterfield, there were spare pairs of safety glasses available at the jobsite.

On cross-examination, Butterfield said that every man was given safety glasses on the night before the accident for his use the next day. He acknowledged that it was strange that plaintiff did not get an extra pair of glasses from the truck when he realized he had forgotten his pair. On redirect, Butterfield stated that the night before the accident plaintiff took his pair of safety glasses and placed them on a shelf in the equipment shed, stating that they were his the next day.

Eugene Stahnke was called to testify and stated that Echo included warnings that eye protection should be worn when operating the trimmer on the product and in the operator's manual.

After Echo rested, third-party defendant Fleet called Barney Miller, one of plaintiff's co-workers, to testify. Miller stated he worked for Fleet in the summer of 1982 and that when he was trained to use the trimmer he was told to wear eye protection. According to Miller, Fleet had a policy requiring eye protection be worn and that such protection was always provided for them, available in either the trucks or in the shop. Miller also said that in the spring of 1982 there was a shop meeting where all the workers were reminded about basic maintenance and the need to wear eye protection. Miller testified that he wore eye protection whenever he used the trimmer and that every

time he saw plaintiff using the trimmer, plaintiff was using eye protection.

The jury found in plaintiff's favor and assessed his total damages at $253,742.70. The jury determined that the percentage of fault attributable solely to plaintiff's assumption of the risk was 90%. After making the appropriate reduction based upon plaintiff's comparative fault, the jury determined that plaintiff's recoverable damages were $25,374.27. The jury found in favor of third-party defendant Fleet on Echo's claim. After the denial of his post-trial motion, plaintiff appeals arguing that the jury's determination that plaintiff assumed the risk is against the manifest weight of the evidence.

OPINION

The sole issue raised by plaintiff in this appeal is whether the jury's finding that plaintiff assumed the risk was against the manifest weight of the evidence. It is well established that it is the jury's function to determine the preponderance of the evidence and its determination will only be reversed when it is against the manifest weight of the evidence. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) A verdict is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or the jury's verdict was palpably erroneous. (*Fakhoury v. Vapor Corp.* (1991), 218 Ill. App. 3d 20, 578 N.E.2d 121.) Plaintiff argues that he "can meet this extremely high standard." We disagree.

Assumption of risk occurs when a user or consumer "voluntarily and unreasonably proceed[s] to encounter a known danger ***. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 423, 261 N.E.2d 305.

In *Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 261 N.E.2d 305, the Illinois Supreme Court established the test to be applied in determining whether a user has assumed the risk. The court stated that it "is fundamentally a subjective test, in the sense that it is *his* knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person." (Emphasis in original.) (*Williams*, 45 Ill. 2d at 430.) Although a subjective test, the determination of whether the plaintiff assumed the risk "is not to be made solely on the basis of the user's own statements but rather upon the jury's assessment of all of the facts established by the evidence." (*Williams*, 45 Ill. 2d at 430.) The striking down of the jury's verdict is "predicated upon consideration of the to-

tality of the evidence in its aspect most favorable to defendant." *Williams*, 45 Ill. 2d at 431.

Plaintiff urges that the assumption of risk question must focus upon the specific risk posed by the particular defect in the product, *i.e.*, the inadequacy of the safety shield, rather than the general danger that accompanies the use of the product. In this vein, plaintiff argues that it is irrelevant that he was cognizant of a general risk of injury in operating the trimmer, rather the evidence must show that he must have been cognizant of the *specific risk* of injury posed by the defect in the product prior to his injury.

■ Plaintiff is correct in asserting that the assumption of risk "is a bar to recovery only if the plaintiff is aware of the product defect and voluntarily proceeds in disregard of the known danger." (*Court v. Grzelinski* (1978), 72 Ill. 2d 141, 149, 379 N.E.2d 281; see also *Kinka v. Harley-Davidson Motor Co.* (1976), 36 Ill. App. 3d 752, 758, 344 N.E.2d 655 ("existence of plaintiff's knowledge of the defect which made the product unreasonably dangerous would seem an essential element of proof of the defense of assumed risk").) Even if the plaintiff's occupation involves certain general risks of injury, for assumption of risk to preclude recovery, plaintiff must be aware of the defect in the product and of the specific risk posed by that product. (*Court*, 72 Ill. 2d at 149; see also *Cavazos v. E.W. Bliss Co.* (1979), 75 Ill. App. 3d 453, 394 N.E.2d 438 (holding reversible error committed in a products liability action when jury was instructed to consider dangers ordinarily accompanying plaintiff's work in assessing whether plaintiff assumed the risk).) Otherwise, "[i]n situations where the nature of plaintiff's employment requires exposure to certain hazards, it would be a *non sequitur* of the policy considerations of strict tort liability to say that plaintiff has voluntarily and unreasonably assumed such hazards by the mere acceptance of his employment." *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 990, 326 N.E.2d 74; see also *Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 246, 373 N.E.2d 1371 (trial judge properly rejected defendant manufacturer's argument that 15-year-old deli worker assumed the risk because she knew the inherent danger of the slicer in question when there was no evidence presented from which the jury could infer that plaintiff "made a considered choice to encounter the danger" posed by the slicer).

In support of his position that the jury's verdict is against the manifest weight of the evidence, plaintiff points to his own testimony that he believed he was in no danger because there was a safety shield at the base of the trimmer which was sufficient to protect him.

In essence, plaintiff argues that the jury verdict cannot stand because no one directly refuted his testimony that he was unaware of the inadequacy of the shield.

While the appropriate test is a subjective one, the plaintiff's testimony as to his own state of knowledge by no means precludes a jury from considering other evidence from which plaintiff's subjective state can be inferred. As the court in *Williams* stated:

"No juror is compelled by the subjective nature of this test to accept a user's testimony that he was unaware of the danger, if, in the light of all of the evidence, he could not have been unaware of the hazard [citation]; and the factors of the user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses, [citations] will all be relevant to the jury's determination of the issue, if raised." *Williams*, 45 Ill. 2d at 430-31.

We note at this juncture that we need not presume that the jury gave credence to plaintiff's testimony. Plaintiff's testimony that he had never been told to wear eye protection, had never worn such eye protection, and had never seen any other employees wear such eye protection was in direct contravention to the testimony of three other witnesses. Of these three witnesses, the jury could have easily given greater weight to the testimony of Butterfield and Miller, both disinterested witnesses who had not had any contact with Fleet or its owners for a considerable period of time prior to the trial. In light of the diametrically opposed testimony offered by the witnesses, the jury could have refused to believe the plaintiff's potentially self-serving testimony that he was unaware of the defect and of the resulting danger that was posed by the trimmer.

■ Contrary to plaintiff's assertions, direct evidence rebutting plaintiff's allegations of ignorance is not necessary to uphold a jury's verdict that plaintiff assumed the risk. Rather, it is within the province of the jury to determine the issue of assumption of risk by inference from evidence that is circumstantial. *Cleveringa v. J.I. Case Co.* (1992), 230 Ill. App. 3d 831, 595 N.E.2d 1193; see also *Williams*, 45 Ill. 2d at 430-31.

■ In this case, there was sufficient evidence presented from which a jury could infer that plaintiff assumed the risk with respect to the safety shield by failing to wear eye protection. First, plaintiff admittedly used a trimmer on 14 to 20 prior occasions, allowing an inference that he was familiar with its discharge characteristics. Second, and perhaps most overridingly, defendant offered substantial testimony that plaintiff was instructed a number of times that safety

glasses were to be worn when this particular weed trimmer was to be used. There was testimony that plaintiff was instructed to wear eye protection in 1981 when he started to work for Fleet, at the beginning of the 1982 season, and on one other occasion when plaintiff was observed operating the trimmer without eye protection.

In addition to the evidence of instruction, there was testimony that all the workers at Fleet with the exception of Sancken used safety glasses whenever operating the trimmer. Moreover, there was testimony by Miller that every time plaintiff operated the trimmer, plaintiff was using eye protection. Furthermore, the trimmer itself contained a label which recited the importance of wearing eye protection and that information was contained in the operator's manual as well.

The jury could have easily inferred that plaintiff recognized the risk of a defective shield from the emphasized need to wear safety glasses. It is readily apparent that safety glasses are intended to protect the user's eyes from flying objects. Consequently, the jury was free to conclude that the directive that these glasses be worn when operating the trimmer would have alerted plaintiff to the potential danger arising from the inadequate shield. Cf. Martinet v. International Harvester Co. (1977), 53 Ill. App. 3d 213, 225, 368 N.E.2d 496 (jury verdict that plaintiff assumed the risk was not against the manifest weight of the evidence when evidence presented showed that plaintiff was injured when he left transmission of bulldozer in gear when attempting to mount the bulldozer; "it is a matter of common knowledge that a man standing on a metal track of a bulldozer, with the motor running and the transmission left in gear, will be in a position of danger if the clutch is bumped so that the track begins to move").

Although plaintiff has a limited educational background and claimed he could not read English at the time of the accident, the jury was in the best position to assess the plaintiff's capabilities and judge whether plaintiff, who had one year of experience working as a landscaper, was capable of making the inference that the shield was not adequate to prevent eye injury by itself. (See Lundy v. Whiting Corp. (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154 (trial court erred in directing verdict in plaintiff's favor when there was sufficient evidence from which the jury could infer that plaintiff assumed the risk, including, (1) plaintiff had operated the machinery in question for 18 months and could have been aware of its defect, (2) plaintiff should have been familiar with operator's practice of not sounding the siren with every crane movement, and (3) place where plaintiff was stand-

ing at the time of the accident was one from which plaintiff's potential awareness of a problem with the product could have been inferred).) Therefore, based upon plaintiff's extensive experience in working with a trimmer, his instruction in the use of safety glasses and his repeated use of such glasses, and the obvious connection between the need to wear safety glasses and the underlying danger of flying objects notwithstanding the presence of the safety shield, we conclude that the evidence was sufficient to allow the jury to infer that plaintiff knowingly appreciated the risk that the shield would not adequately protect his eyes from projectiles.

Plaintiff attempts to characterize all of defendants' evidence as merely informing plaintiff of the "general danger" which existed if the trimmer was used without eye protection, rather than evidence that plaintiff knew of the specific danger. In this respect, plaintiff cites *L.D. Brinkman & Co.-Midwest v. National Sponge Cushion Co.* (1979), 76 Ill. App. 3d 683, 394 N.E.2d 1221, arguing that it supports his position that evidence demonstrating the general danger inherent in a product is not sufficient to prove that plaintiff assumed the specific risk resulting from the defect in the product.

In *Brinkman*, plaintiff used a welder near some carpet padding which he knew to be flammable, keeping a fire extinguisher at hand in case the padding caught fire. The *Brinkman* plaintiff was completely unaware, however, of the specific defects in the padding which included "extreme flammability," the "rapid spread of the resulting fire" and the "inextinguishability of the flames." (76 Ill. App. 3d at 692.) The court found the plaintiff's actions in using the welder and keeping a fire extinguisher nearby did not evidence assumption of the risk and ruled that the trial court should have directed a verdict in plaintiff's favor on this issue.

Unlike *Brinkman,* the actions tending to show that plaintiff here was aware of the general danger do not negate or conflict with a finding that plaintiff was aware of the specific risk. In *Brinkman*, plaintiff's actions which showed an appreciation of the general risk also demonstrated his complete ignorance of the specific danger posed by the product. Clearly, plaintiff would not have positioned a fire extinguisher near him if he knew that the extinguisher was incapable of putting the fire out. In contradistinction, the evidence presented in this case is sufficient to establish plaintiff's awareness of the general dangers and his inferential awareness of the particular defect. The general danger of injury from flying objects by its very nature must ultimately focus upon the insufficiency of the shield to protect against this risk. Consequently, while we agree with plaintiff that the evi-

dence presented would inform plaintiff of the general danger or risk, it does not preclude the jury from concluding, as demonstrated earlier, that this same evidence also alerted plaintiff to the specific risk or danger involved. See *Hackett v. Equipment Specialists, Inc.* (1990), 201 Ill. App. 3d 186, 559 N.E.2d 752 (in addition to demonstrating that plaintiff could have possessed a "general awareness" to the alternatives to placing her hand near moving machinery, evidence could support a jury verdict that plaintiff assumed the risk by sticking her arm into the corn husker when such evidence demonstrated that plaintiff had been instructed never to try and unclog or place her hand in the machine and that she could have stopped the machine and that the machine would be stopped in one minute regardless of her actions).

Finally, plaintiff urges that the Illinois Supreme Court's decision in *Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170, directs that we find as a matter of law that plaintiff did not assume the risk. In *Sweeney*, plaintiff, a carpenter, was injured when using special purpose concrete nails manufactured by the defendant. When plaintiff hit the heads of the first several nails, they broke off and flew across the room. The fourth or fifth nail he struck shattered, injuring his eye. Plaintiff was not wearing eye protection at the time of the incident even though his employers instructed its carpenters to wear such protection when hammering concrete nails.

The result in *Sweeney* is not inconsistent with the defendant's position in this case. In *Sweeney*, the jury returned a verdict for plaintiff whereas here the jury's verdict was for the defendant. Based upon the evidence in *Sweeney*, there is no reason to presume that the jury's determination in that case would require reversal if the jury had instead found for the defendant.

By the same token, nothing in our own decision would necessitate a reversal if the jury had found for plaintiff. Although the evidence favoring defendants is stronger than the facts in *Sweeney*, with respect to plaintiff's age, experience in landscaping and use of the trimmer, and the extensive testimony establishing that he was aware of the need to wear safety glasses, the jury in this case could still have chosen to believe plaintiff's testimony which disputed the foregoing facts and found in his favor, but it did not. In both *Sweeney* and the case at bar, the jury verdict was not against the manifest weight of the evidence and in either case there would have been enough evidence contrary to the given verdict to have sustained a contrary verdict as well. Accordingly, we find that the jury's verdict that the

plaintiff was 90% at fault because he assumed the risk is not against the manifest weight of the evidence.

For the foregoing reasons, we affirm the judgment of the trial court.

Judgment affirmed.

McNULTY and COUSINS,* JJ., concur.

---

*Justice Lorenz originally sat on the panel of this case. After he retired, Justice Cousins substituted on the panel, and he has read the briefs and listened to the tape of oral argument.