SEAN KENNAN, Plaintiff-Appellee, v. CHECKER TAXI COMPANY, INC., Defendant-Appellant (Shibli Khalil, Defendant).

First District (5th Division)   No. 1—91—0961

Opinion filed July 23, 1993.—Rehearing denied August 26, 1993.

Torshen, Schoenfield & Spreyer, Ltd., of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for appellant.

Brian J. O'Connor III, of Chicago (David A. Novoselsky, of counsel), for appellee.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Checker Taxi Company, Inc. (Checker), appeals from a judgment for compensatory and punitive damages entered in favor of the plaintiff, Sean Kennan. This action arose from an altercation between plaintiff, a blind man, and a Checker cab driver. Plaintiff's fifth and final amended complaint contained three counts: count I alleged assault and battery; count II alleged wrongful ejectment; and count III sought punitive damages. Prior to the commencement of trial, plaintiff voluntarily dismissed the defendant driver. At the conclusion of the trial, the jury returned a verdict finding Checker liable and awarding plaintiff $120,000 in compensatory damages and $193,000 in punitive damages. Judgment was entered on the verdict.

Checker raises the following issues on appeal: (1) whether the trial court erred in submitting the question of punitive damages to the jury when there was no evidence of corporate complicity by Checker in the driver's conduct; (2) whether the $120,000 award of compensatory damages was excessive and beyond the range of damages reasonably supported by the proofs; and (3) whether the defendant was denied a fair trial due to the improper conduct of plaintiff's counsel and/or other trial errors.

We affirm in part and vacate in part.

BACKGROUND

Plaintiff is blind and relies on his seeing eye dog for assistance. At approximately 8 a.m. on the morning of February 5, 1985, plaintiff was on his way to work. He got off the elevated at Chicago Avenue and proceeded with his guide dog, Ives, to the southwest corner of Chicago and Franklin, where he sought to hail a cab. Plaintiff placed his guide dog on the curb, extended the leash and stepped into the street to wave down a cab. He was not wearing dark glasses or carrying a cane at the time.

While he was standing on the street, a woman passerby offered to help plaintiff hail a cab. Plaintiff accepted her assistance and the woman hailed Checker Cab number 3711. When the cab stopped, plaintiff opened the door, and summoned his dog, which entered the cab and sat on the backseat behind the driver. Plaintiff then got in and sat next to the dog.

After plaintiff told the driver his destination, the driver began screaming over and over, "get out, I no take bitch." Plaintiff then heard the rear door open and he moved his hand over Ives to protect him. When plaintiff felt the driver's hand touch the back of his hand and the back of Ives' head, he pushed the driver away from his dog. At this point plaintiff either got himself out of the cab or was pulled out of the cab by the driver. The driver slammed plaintiff against the side of the cab and hit him in the head and the face several times.

Ellen Karp, who was waiting at the bus stop, observed the altercation and stepped into the street between plaintiff and the driver. She said to the driver, "Are you an idiot? Can't you tell the guy is blind?" The driver stopped scuffling with the plaintiff and responded, "No, I couldn't tell he was blind, but look what the dog did to may [sic] car." Ms. Karp testified that she saw nothing wrong with the cab.

At this point, an unidentified woman escorted plaintiff and the dog away from the cab, hailed another cab and helped plaintiff get inside it. The Checker driver got back in his cab and drove away.

Plaintiff proceeded to work without further incident. Upon arriving at work, plaintiff did not relate the incident to anyone or call the police. Plaintiff sustained painful bruises on his face and head due to the altercation with the cab driver, but he did not seek medical attention for the bruises and he did not lose time from work due to the incident. Plaintiff testified that the pain from the bruises lasted for several days.

Later that day, plaintiff telephoned Dr. Janice Swope, the psychiatrist he had been seeing since 1980, and related the incident. Dr. Swope did not prescribe any medication for plaintiff as a result of the incident. During the month after the occurrence, he did not see her any more often than he had prior to the occurrence.

On the day of the occurrence, Rebecca Smith, who was a witness to the altercation, called Checker, the city department of consumer services, and the city licensing division to report the incident. Ms. Karp also called Checker, and at Checker's suggestion, called the city where she was transferred to the corporation counsel's office.

Within a day or two of the incident, an investigator from Checker visited plaintiff at his home and made a written report of plaintiff's account. A sighted friend of plaintiff's was present and read the report to him before he signed it.

Plaintiff testified that since the incident, he was frightened in most transportation situations; if he had to use a cab, he didn't know whether there would be a similar occurrence and he was concerned about how distressed and upset he might appear when he reached his destination. Thus, plaintiff sought to arrange his commuting schedule in a manner which allowed him to use the bus and elevated system and to avoid taking cabs.

Dr. Swope testified that plaintiff telephoned her on the day of the occurrence, that she and plaintiff dealt with the incident in every session for a number of sessions and that it continued to be part of their ongoing discussions. It was her opinion that plaintiff's condition prior to February 5, 1985, made him susceptible to a heightened emotional injury as a result of the cab incident on February 5, 1985. In her opinion, as a result of the incident, plaintiff suffered from post-traumatic stress disorder. She explained that he continued to view cabs as potentially traumatic, anxiety-provoking, humiliating events. It was her opinion that his condition would probably continue in the future to some extent but she could not say for how long.

At the conclusion of the trial, the jury returned a verdict finding Checker liable and awarding plaintiff $120,000 in compensatory damages and $193,000 in punitive damages. Judgment was entered on the verdict, and Checker's post-trial motion was denied. This appeal followed.

OPINION

I

Checker first contends that the trial court erred in submitting the question of punitive damages to the jury because plaintiff failed to present any evidence of corporate complicity by Checker in the driver's conduct. In other words, Checker argues that the trial court should have directed the verdict for Checker at the close of the evidence because plaintiff failed to prove an element of his case.

■ Plaintiff maintains that Checker has waived this argument because it did not raise the corporate complicity issue until the post-trial motion. We disagree. Although Checker did not move for a directed verdict based upon this argument, Checker did make a post-trial motion for judgment *n.o.v.* on this basis. Checker's failure to move for a

directed verdict on the ground that plaintiff failed to prove an element of his case did not preclude Checker from seeking judgment *n.o.v.* in a post-trial motion on the same ground. Section 2—1202 of the Code of Civil Procedure sets forth the relief available via a post-trial motion and provides in relevant part:

> "Relief after trial may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury even though no motion for directed verdict was made or if it was denied or ruling thereon reserved." Ill. Rev. Stat. 1991, ch. 110, par. 2—1202(b).

A post-trial motion for judgment *n.o.v.* is an appropriate vehicle to challenge the plaintiff's failure to prove an element of his case. (See *Quad County Distributing Co. v. Burroughs Corp.* (1979), 68 Ill. App. 3d 163, 166-67.) We conclude that Checker has not waived the right to challenge plaintiff's alleged failure to prove the necessary elements of a claim for punitive damages.

The standard for reviewing the refusal to direct a verdict or grant judgment *n.o.v.* is well settled. (See *Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 569, *appeal denied* (1992), 145 Ill. 2d 635.) Verdicts should be directed and judgments *n.o.v.* entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Keeping this standard in mind, we turn now to the merits of Checker's argument.

It is well settled that punitive damages may be awarded when torts are committed with "fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186.) Punitive damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404.) Certainly, there was evidence presented at trial which tended to show that the Checker *driver* acted willfully and wantonly when he assaulted and battered the plaintiff. However, the driver was dismissed from the case prior to trial; plaintiff sought to hold Checker liable solely on the theory of *respondeat superior*.

■ When the liability of a corporate defendant is predicated upon a theory of *respondeat superior*, the imposition of punitive damages is narrowly circumscribed. (See *Mattyasovszky v. West Towns Bus Co.*

(1975), 61 Ill. 2d 31.) In *Mattyasovszky*, the Illinois Supreme Court stated:

"[T]he punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously. [Citations.] With respect to this problem, section 217C of the Restatement (Second) of Agency (1958) states:

'Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of his employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.' " (*Mattyasovszky*, 61 Ill. 2d at 36-37.)

The principles set forth in *Mattyasovszky* have been repeatedly applied by our courts of review. See, *e.g.*, *Deal v. Byford* (1989), 127 Ill. 2d 192; *Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188; *Lohrenz v. Country Mutual Insurance Co.* (1989), 189 Ill. App. 3d 810; *Riley v. Fair & Co. Realtors* (1986), 150 Ill. App. 3d 597; *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484; *Oakview New Lennox School District No. 122 v. Ford Motor Co.* (1978), 61 Ill. App. 3d 194; *Samuels v. Checker Taxi Co.* (1978), 65 Ill. App. 3d 63; *Tolle v. Interstate Systems Truck Lines, Inc.* (1976), 42 Ill. App. 3d 771.

■ The rationale for requiring the plaintiff to show complicity on the part of the principal before punitive damages may be awarded against the principal was aptly explained in *Tolle*:

"The complicity rule *** seems consistent with the rationale behind the concept of punitive damages. Either as a basis for punishment or for deterrence of wrongdoers, some *deliberate corporate participation* should be shown before this sanction is applied. [Citation.] The complicity analysis will allow punitive damages where the institutional conscience of the corporate master should be aroused while protecting the corporate master from liability for punitive damages when a properly supervised employee acts with requisite circumstances of aggravation. [Citation.]" *Tolle*, 42 Ill. App. 3d at 773-74.

Plaintiff concedes that Illinois law requires a showing of complicity before punitive damages will be awarded against a corporate defendant charged solely with vicarious liability, but argues that an exception exists for common carriers. Plaintiff relies on several early cases from the Illinois Supreme Court which allowed punitive damages to be awarded against common carriers on the basis of the willful and wanton conduct of the conductors employed by the carriers. (*Chicago Consolidated Traction Co. v. Mahoney* (1907), 230 Ill. 562; *Chicago Union Traction Co. v. Brethauer* (1906), 223 Ill. 521; *Illinois Central R.R. Co. v. Davenport* (1898), 177 Ill. 110; *Chicago, Burlington & Quincy R.R. Co. v. Bryan* (1878), 90 Ill. 126.) Although these cases arguably support the proposition that punitive damages may be available against a common carrier charged with vicarious liability, these cases are not in accord with the current state of the law in Illinois. See *Mattyasovszky*, 61 Ill. 2d 31.

*Mattyasovszky*, the first case in which our supreme court approved the complicity rule, involved a common carrier. The court's awareness that the defendant was a common carrier is underscored by the following statement from the opinion:

"Serious questions inevitably arise in a case like the present, in which *the driver of the bus*, whose conduct was primarily responsible for the injury, is no longer a party defendant because he was dismissed by the plaintiff before the case went to the jury." (Emphasis added.) (*Mattyasovszky*, 61 Ill. 2d at 37.)

Nothing in the *Mattyasovszky* opinion suggests that a different rule should apply when the "master or other principal" is a common carrier. We conclude that Illinois law does not recognize a common carrier exception to the corporate complicity doctrine.

Plaintiff was not entitled to recover punitive damages against Checker unless he presented sufficient evidence to demonstrate the existence of one of the elements of corporate complicity set forth in *Mattyasovszky*: (a) Checker authorized the doing and the manner of the act, or (b) the cab driver was unfit and Checker was reckless in employing him, or (c) the cab driver was employed in a managerial capacity and was acting in the scope of his employment, or (d) Checker or a managerial agent of Checker ratified or approved the act. (*Mattyasovszky*, 61 Ill. 2d at 36-37.) Plaintiff maintains that the offer of proof he made at trial contained evidence which would show that Checker authorized the actions of the cab driver which caused plaintiff's injury.

■ Plaintiff sought to present evidence which would establish the following: (1) Checker received a memorandum from the City of Chi-

cago advising cab companies of their legal duty to transport blind persons; (2) prior to February 5, 1985, plaintiff was a regular user of taxis and he had made several complaints to Checker about the refusal of Checker to pick him up; and (3) other blind persons had been refused transportation by Checker taxis. When this evidence is viewed in the light most favorable to the plaintiff, it demonstrates only that Checker may have been aware of the fact that some cab drivers refused to transport blind persons. However, plaintiff's injuries were not caused by a driver refusing to transport him. Plaintiff's injuries were caused by the driver forcibly ejecting him from the cab and/or assaulting and battering him. The evidence does not establish that Checker knew of or authorized cab drivers to forcibly eject or assault and batter their customers. Thus, this evidence is not probative of the authorization element of corporate complicity set forth in *Mattyasovszky*.

Plaintiff next argues that Checker ratified the acts of its driver by defending this lawsuit and the actions of its driver. In support of his contention, plaintiff cites *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021. *Robinson* is distinguishable, however. In *Robinson*, the plaintiff alleged that she had been falsely imprisoned by a store security guard. Prior to bringing suit, plaintiff sent a written complaint to the store manager but received no response. In addition, the trial court found that the defendant had not only defended the actions of its agent, but also had shown no attempt to alter its procedures in regard to situations like the one the plaintiff encountered. (*Robinson*, 104 Ill. App. 3d at 1025.) In light of these facts the trial court held that defendant had ratified the conduct of its agent. *Robinson*, 104 Ill. App. 3d at 1025.

Unlike the defendant in *Robinson*, Checker did not ignore plaintiff's complaint. Within a day or two of the incident an investigator from Checker visited plaintiff at his home and made a written report of plaintiff's account. Moreover, the evidence demonstrated that Checker's president responded to the report of the driver's conduct by directing that he was not to be given another lease. The parties stipulated that the cab driver was no longer associated with Checker. Checker did not ratify the actions of its driver simply by defending this lawsuit.

In order to recover punitive damages under Illinois law, plaintiff must plead and prove the existence of at least one of the elements of corporate complicity set forth in *Mattyasovszky*. In the instant case, there was no evidence that (a) Checker authorized the doing and the manner of the act complained of in plaintiff's complaint, or (b) that

the driver was unfit for his position and Checker was reckless in permitting him to drive a Checker taxicab, or (c) that the driver was employed in a managerial capacity and was acting in the scope of his employment, or (d) that Checker or a managerial agent of Checker ratified or approved the act. The verdict should have been directed for the defendant on the punitive damages count because the plaintiff failed to prove an essential element of his claim. Nonetheless, the trial court ruled that the issue of punitive damages should go to the jury based solely upon evidence of willful and wanton conduct on the part of the driver and instructed the jury accordingly. The trial court's submission of the question of punitive damages to the jury was contrary to the law of this State as set forth in *Mattyasovszky* and its progeny. Accordingly, we hold that the portion of the verdict which awarded punitive damages to the plaintiff must be set aside.

## II

Checker next contends that the jury's award of $120,000 in compensatory damages was excessive and unsupported by the evidence. We disagree.

The propriety of the amount of damages to be awarded for personal injuries is peculiarly a question of fact for the jury. (*Carter v. Indiana Harbor Belt R.R. Co.* (1989), 190 Ill. App. 3d 1052, 1059.) A reviewing court will not substitute its judgment for that of the jury as to the sum to be awarded unless the total amount of the verdict falls outside the limits of fair and reasonable compensation, or results from passion or prejudice, or is so large as to shock the judicial conscience. *Carter*, 190 Ill. App. 3d at 1059.

When assessing damages in an assault and battery case, the jury may properly consider and allow compensation for the pain and suffering incurred by the plaintiff as a result of the blows inflicted, and for the humiliation, indignity, and vexation suffered by the plaintiff as a result of his assailant's conduct. (*Chicago & Alton Ry. Co. v. Tracey* (1903), 109 Ill. App. 563.) In the instant case, the evidence adduced at trial indicated that the plaintiff was a blind man who relied upon a seeing eye dog for assistance. Although plaintiff became blind approximately nine years prior to the incident, he was still experiencing difficulty in adjusting to his blindness. This difficulty caused plaintiff to be in an emotionally vulnerable state. Plaintiff did nothing to provoke the attack of the cab driver; he was a completely defenseless victim. Plaintiff was beaten about the head and face and sustained painful bruises which lasted for several days. He suffered the humiliation of being assaulted and beaten in a public place in broad daylight.

Plaintiff's psychiatrist testified that plaintiff continued to be traumatized by the experience and his fear that a similar attack could occur at any time. Finally, plaintiff's fear of cab drivers has forced him to modify his method of commuting in order to avoid cabs. On these facts we cannot say that the award of damages was unreasonable or shocking to the judicial conscience. Accordingly, we hold that the compensatory damages were not excessive.

### III

Checker's final contention is that the improper conduct of plaintiff's counsel by itself or in combination with other trial errors deprived Checker of a fair trial.

■ Checker raises the following allegations of error: (1) plaintiff's counsel improperly attempted to indoctrinate the jury about this being a "personal" case; (2) plaintiff's counsel improperly sought to appeal to the sympathies of the jurors; (3) plaintiff's counsel improperly commented on the absence of a witness equally within the parties' control during rebuttal; and (4) plaintiff's counsel improperly exceeded the bounds of proper rebuttal argument. We have carefully examined the record concerning these allegations of error and we find the contentions concerning them to be without merit or, in cases where there is substance to the contention, the error was not prejudicial.

Checker was not entitled to an error-free trial, only a fair trial. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 559.) " 'Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed.' " (*Lawson,* 64 Ill. 2d at 559, quoting *Both v. Nelson* (1964), 31 Ill. 2d 511, 514.) The evidence of liability in this case was overwhelming and mostly undisputed. Viewed in its entirety, the trial was fair and none of Checker's allegations of error merit reversal of the verdict.

In summary, we hold that the trial court erroneously submitted the issue of punitive damages to the jury, and, therefore, that portion of the verdict must be set aside. The award of compensatory damages was not excessive and will stand. Finally, defendant was not deprived of a fair trial. The judgment of the trial court is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

GORDON, P.J., and McNULTY, J., concur.